# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

Paul and Jennifer Dougall,
in their own capacities and as
natural guardians of a minor,
A.D.

                    **Plaintiffs,**

          **-vs-**

Copley-Fairlawn City School
District Board of Education,
et al.,

                  **Defendants**

Case No.  5:17cv1664


JUDGE PAMELA A. BARKER


MEMORANDUM OPINION AND ORDER

Currently pending is the Amended Motion of Plaintiffs Paul and Jennifer Dougall, in their own capacities and as natural guardians of a minor, A.D., for Judgment on the Administrative Record regarding their claims under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*.  (Doc. No.  49.)  Defendants Copley-Fairlawn City School District Board of Education; Board Members Kenneth Calderone, Jessica Vargo, Paul Cevasco, Sue Emich and Richard Levin; and Copley-Fairlawn Schools Superintendent Brian Poe[1] filed a Brief in Opposition (Doc. No. 50), to which Plaintiffs responded (Doc. No. 51.)

For the following reasons, Plaintiffs' Amended Motion (Doc. No. 49) is DENIED.

## I.     Factual Background

---

[1] Hereinafter, Defendants Copley-Fairlawn City School District Board of Education, the individual Board Members, and Superintendent Poe will be referred to collectively as "CFCSD Defendants."

A.D. was a student in the Copley-Fairlawn City School District ("CFCSD") from Kindergarten until her withdrawal in November 2015, when she was in ninth grade. (Administrative Record ("A.R.") (Doc. No. 34) at 973.)[2] The primary issues in this case are (1) whether the CFCSD Defendants violated the child find provisions of the IDEA by failing to evaluate A.D.'s eligibility for an IEP prior to her expulsion from CFCSD in October 2015; and (2) whether the CFCSD Defendants violated the IDEA by failing to complete an IDEA evaluation of A.D. after Plaintiffs allegedly revoked consent for such evaluation in January 2016. The Court will set forth the relevant facts with these issues in mind.

### A. Elementary School through Eighth Grade

The parties do not direct this Court's attention to much testimony and evidence relating to A.D.'s elementary school years (i.e., Kindergarten through fifth grade). A.D.'s parents testified generally that A.D. has had irritable bowel issues since the second grade, which caused her to have to frequently go to the bathroom and sometimes caused her to soil herself. (A.R. 1820 (Tr. 1081-1082); A.R. 1822 (Tr. 1089)). Mrs. Dougall also testified that, although A.D. was not diagnosed with autism until much later, A.D. must have had autism since birth, as autism "is not an acquired disorder."[3] (A.R. 1818-1819 (Tr. 1074-1076.) She testified that, looking back, she believes A.D. suffered from anxiety and social problems throughout elementary school. *See, e.g.,* A.R. 1820 (Tr. 1081-1082.)

---

[2] All citations to the Administrative Record ("A.R.") (Doc. No. 34) will be to the page number that is printed in red and located at the bottom of each page. When citing to the due process hearing transcript (which is a part of the Administrative Record), the Court will cite to both the A.R. number and the specific Transcript page number.

[3] Mrs. Dougall testified that she is a professional clinical counselor. (A.R. 1797-1798 (Tr. 990-991)). She testified that, as a counselor, she is able to diagnose her clients using the Diagnostic and Statistical Manual ("DSM-5") but is not able to diagnose her own family or children. (*Id.* at Tr. 993-994.)

When A.D. was in fifth grade (i.e., the 2011-2012 school year), she was placed in a special, all-girls, lunch group "so that she wouldn't feel alone." (A.R. 2007-2008 (Tr. 1517-1518); A.R. 2279 (Tr. 2249-2250)). In addition, Mrs. Dougall testified that, at her request, the school moved A.D. to a different math class because the noise level in her current class was distracting to her and affecting her grades. (A.R. 2007-2008 (Tr. 1517-1518)). Mrs. Dougall also testified that A.D.'s gastrointestinal problems caused A.D. to have to go to the bathroom frequently during the fifth grade, causing Mrs. Dougall to reach out to A.D.'s fifth grade teacher for understanding regarding the issue. (A.R. 2008 (Tr. 1520-1521)).

Despite these issues, however, the record reflects that, academically, A.D. was a strong student during both the fifth and sixth grades. Specifically, the record reflects that A.D.'s grades consisted primarily of A's and B's during this time period,[4] and that A.D. was moved into an advanced reading group during the fifth grade. (A.R. 3136; A.R. 2294 (Tr. 2307)). A.D.'s guidance counselor, Thea Sako, testified that A.D. was a "high achiever" during fifth and sixth grade, and that she did not recall being aware that A.D. was having any difficulties in school during this time period. (A.R. 2283 (Tr. 2265-2267)). Notably, Ms. Sako testified that A.D. developed a "very good friendship" with one girl in her lunch group (A.R. 2287 (Tr. 2282)) and stated that "[f]rom what I recall in the lunch group, she was very much a part of the group and [a] typical 5th grade girl with the rest of the girls." (A.R. 2287 (Tr. 2282, 2284)). Ms. Sako further testified that, at that time, she did

---

[4] The record also contains a document containing A.D.'s "yearly averages" during Kindergarten and first through fourth grades. (A.R. 3137.) This document appears to indicate that, in fourth grade (i.e., the 2010-2011 school year), A.D. received A's in Reading, English, Spelling, Math, Social Studies, and Science. (*Id.*)

not have any reason to suspect that A.D. might be a child with a disability in need of special education. (A.R. 2283 (Tr. 2267)).

The Dougalls testified that A.D. experienced increased problems with her teachers and peers during the seventh and eighth grades (i.e., the 2013-2014 and 2014-2015 school years, respectively). Of particular note, in September 2014 (when A.D. was in the eighth grade), an incident occurred on a school bus during which a student threatened to "shove pills down [A.D.'s] throat" and "dig a hole and watch [her] burn." (A.R. 3711, 3716.) Shortly thereafter, a student called A.D. a "snitch." (A.R. 3710, 3708.) The following month, Mrs. Dougall contacted the school to complain after learning that A.D.'s band teacher allegedly called A.D. "stupid" after she left the band room. (A.R. 3861-3862.) Mrs. Dougall also noticed inattention and focus issues during this time period[5], as well as problems with increased anxiety. (A.R. 1821-1822 (Tr. 1086-1091)). Mr. and Mrs. Dougall both testified regarding numerous instances of alleged bullying, particularly during A.D.'s eighth grade year.[6] *See e.g.*, A.R. 1715-1721 (Tr. 790-817); A.R. 2041-2044 (Tr. 1653-1665).

---

[5] The record reflects that, in January 2014, Mrs. Dougall requested that A.D. be switched to a different foreign language class due to excessive noise. (A.R. 3849.)

[6] For example, Mrs. Dougall testified that, when she was in eighth grade, A.D. was called a "whore, slut, and a cold-hearted bitch" by another student. (A.R. 2041 (Tr. 1653)). She also testified that A.D. "was bullied at the football game by a girl that has continued to say derogatory comments to her," including calling her a "princess." (A.R. 2041-2042 (Tr. 1653, 1655)). In addition, Mrs. Dougall testified that they had to move A.D. to a different gym class in eighth grade "because other girls excluded her from being on their team or they verbally complained about having her on their team." (A.R. 2042 (Tr. 1655)). Mrs. Dougall testified that A.D. was manipulated into being a girlfriend to a boy in the eighth grade because the boy said that "if she wasn't his girlfriend that he would kill himself." (A.R. 2042-2043 (Tr. 1657-1658)). Mrs. Dougall also testified that A.D. did not go on the Washington D.C. trip in 8th grade because she was afraid she would be bullied. (A.R. 2044 (Tr. 1664-1665)). The Court notes that, with regard to some of these incidents, the IHO noted as follows: "Because Mother did not witness the events she testified about regarding Student's behavior when she was not present, and cannot diagnose her daughter, her testimony was not weighed as substantially as the testimony of eyewitnesses to events. Mother's recall of facts was inconsistent." (A.R. 971.)

Mrs. Dougall testified that she and Mr. Dougall "started noticing behavior changes and withdrawal and isolation in the fall of 2014," when A.D. was in the eighth grade. (A.R. 1819 (Tr. 1077)). In December 2014, A.D. expressed suicidal ideation, after which she began regular psychiatric counseling. (A.R. 1819 (Tr. 1077-1087)). Mrs. Dougall testified that she promptly notified A.D.'s guidance counselor, Robert Cowie, regarding A.D.'s suicidal ideation and treatment. (*Id.*) Mr. Cowie did not recall being advised that A.D. had experienced suicidal ideation. (A.R. 2526, 2527 (Tr. 2810, 2817)).

In early 2015, the Dougalls arranged for A.D. to undergo a private psychological assessment. As part of this assessment, several of A.D.'s teachers completed questionnaires regarding A.D.'s classroom behavior. A.D.'s eighth grade accelerated math teacher, Timothy Green, noted several concerns regarding A.D.'s behavior in his questionnaire responses. (A.R. 3661-3664.) In particular, he indicated that A.D. "often" exhibited the following behaviors and/or traits: (1) has difficulty paying attention to tasks; (2) does not seem to listen when spoken to directly; (3) is easily distracted by other things going on; (4) is touchy or easily annoyed by others; (5) is angry and resentful; (6) acts restless or edgy; (7) is irritable; (8) is more anxious in social situations than most other youths; (9) is excessively shy; and (10) seems to have lost interest in doing things or talking to people. (*Id.*) Mr. Green also stated that A.D. "very often" exhibited the following behaviors: (1) is extremely tense or unable to relax; (2) is emotionally cold or indifferent towards people; and (3) shows little interest in (or enjoyment of) pleasurable activities. (*Id.*) In the narrative section of the questionnaire, Mr. Green observed as follows:

> [A.D.] does not seem to take non-verbal cues. She also does not seem to have an accurate read of social environments within the class, social norms. Her actions are not wildly attention grabbing, they just seem odd to myself and occasionally her peers.

5

(A.R. 3664.)

During the due process hearing, Mr. Green testified that A.D. had poor eye contact, was socially awkward, and "didn't really seem like she was ultra-engaged in what was happening." (A.R. 2336, 2337 (Tr. 2327-2328, 2330)). However, he testified that this did not impact A.D.'s ability to understand the class material or otherwise affect her grades or her performance in his class. (A.R. 2336-2337 (Tr. 2328-2331)). Mr. Green further noted that, although he thought A.D. might be on the "very low end" of the autism spectrum, he did not think that she needed any specially designed instruction. (A.R. 2338 (Tr. 2336-2337)). He stated he had "no concerns" regarding A.D.'s academic performance. (A.R. 2339 (Tr. 2341). The record reflects that A.D. received B's each quarter in Mr. Green's accelerated math class. (A.R. 3133.)

Several of A.D.'s other eighth grade teachers also testified at the due process hearing. A.D's eighth grade English/Language Arts teacher Adam Virgei, testified that A.D. was a strong English student, both in terms of her writing and her ability to speak in public. (A.R. 2355 (Tr. 2404-2405)). Although he remembered A.D. as being "a little shy" at the beginning of the school year, he testified that she became less so as the year progressed and had no difficulty relating to others or maintaining eye contact. (A.R. 2358, 2362 (Tr. 2414, 2430-2432)). Mr. Virgei also testified he did not see any evidence of depression, anxiety, or lack of attention or focus. (A.R. 2358, 2369 (Tr. 2414-2416, 2458-2461)). Mr. Virgei noted that A.D. received an A in his class during the third and fourth quarters and stated that he did not think there was any reason for A.D. to have had an Individualized Education Plan ("IEP").[7] (A.R. 3135; A.R. 2357 (Tr. 2413)).

---

[7] The Sixth Circuit has described IEPs as follows: "The IEP is 'the centerpiece of the [IDEA]'s education delivery system for disabled children.' *Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). The IEP must state the student's educational status, the annual goals for the student's education, the special-educational services and aides to be

A.D.'s eighth grade science teacher, Hallie Simenc, also testified that she had no reason to suspect that A.D. needed special education services. (A.R. 2427 (Tr. 2558)). Ms. Simenc indicated that A.D. was a good student and did very well in her class. (A.R. 2426-2427 (Tr. 2554, 2558)). She noted in particular that A.D. worked well in groups, stating "she definitely had a group of students that she enjoyed working with in my classroom." (A.R. 2426 (Tr. 2553)). Ms. Simenc characterized A.D.'s class participation as "great" and testified that A.D. had no problems interacting with other students. (A.R. 2426-2427 (Tr. 2554-2555)). The record reflects that A.D.'s final eighth grade science grade was a B. (A.R. 3133.)

The Independent Hearing Officer ("IHO") that presided over A.D.'s due process hearing found that Mr. Green, Mr. Virgei, and Ms. Simenc were all credible witnesses. (A.R. 972-973.)

A.D.'s private psychological evaluation was completed on May 23, 2015 by psychologist Tracie Baker, Ph.D. (A.R. 3775-3782). In her report,[8] Dr. Baker noted that A.D. had been receiving therapy services and had "recently started Prozac to address anxiety." (A.R. 3775.) Based on her testing and assessment, Dr. Baker found that A.D. met the diagnostic criteria for Autism Spectrum Disorder without accompanying intellectual impairment or language impairment, Level 1. (A.R. 3778.) She noted that "'Level 1' indicates that [A.D.'s] Autism Spectrum Disorder is mild, but she has difficulty initiating social interactions, struggles with responding appropriately to the social overtures of others, appears to have decreased involvement in social interactions, and has problems with flexibility." (*Id.*) Dr. Baker also determined that "interview information, patient rating scales,

---

provided to meet those goals, and the extent the student will be 'mainstreamed,' i.e., spend time in school environments with non-disabled students. § 1414(d)(1)(A)." *L.H. v. Hamilton County Dep't of Education*, 900 F.3d 779, 788 (6th Cir. 2018).

[8] Dr. Baker did not testify during A.D.'s due process hearing.

and personality assessment was consistent with symptoms of depression and anxiety." (*Id.*) She found that, while A.D. displayed "significant inattentiveness" on one test, she did not meet the criteria for Attention-Deficit/Hyperactivity Disorder. (*Id.*) Finally, Dr. Baker assessed Generalized Anxiety Disorder, and Adjustment Disorder with Depressed Mood. (A.R. 3779.)

Dr. Baker recommended that A.D. continue with her therapy services and medication management. (A.R. 3779.) She suggested that A.D. participate in social skills training and recommended the Dougalls contact the Anxiety Disorders Clinic at the Akron Children's Hospital for additional resources. (A.R. 3780-3781.) Finally, with regard to Academic/School recommendations, Dr. Baker stated as follows:

> While [A.D.] does well in school, at least one teacher has noticed [A.D.'s] seeming stressed and unhappy at times. The social world at school appears to be a large part of her distress. Considerations include:

> - [A.D.] has reportedly experienced significant bullying; the nature of the bullying was severe and [A.D.] still sees them. It is recommended that attempts to prevent [A.D.] from getting into such a situation again; these may include assigning a teacher 'mentor' to take a special interest in [A.D.] and pay attention to her interactions with peer[s], working with [A.D.] on identifying signs of an unhealthy friendship and how to know when to resolve problems with friends and when to end friendships.

> - **** Given the bullying at her current school, they should consider whether it is an option to explore private schools or schools for children with high functioning Autism Spectrum Disorders (that may have smaller class sizes or more structured social interactions so [A.D.] does not get lost socially). ***

> - [A.D.'s] parents should be aware of the Ohio Autism Scholarship Program. Children in grades K-12 with an Individualized Education Program (IEP) with an Autism classification are eligible for $20,000 per year to put toward a school that is an accepted provider under the Ohio Autism Scholarship program. * * * **A challenge for [A.D.] may be qualifying for an IEP, as her grades are not impaired. At the same time, her family may make a case to the school district's Special Education department to discuss the problems that [A.D.] has with social skills and emotional management (which are part of her Autism Spectrum Disorder), which significantly impacts her happiness and social growth in school.**

8

- It is recommended a plan for [A.D.] is developed for her to follow when she is overwhelmed (e.g., when she feels overly agitated and 'needs to walk.') A structured plan that all of her teachers agree to may allow her to take a pass to the rest room, the office, or another specified place when she is overwhelmed and needs a break. Limits may need to be put on the pass to prevent overuse.

(A.R. 3781) (emphasis added).

**B.     Summer between Eighth and Ninth Grade**

Shortly thereafter, on May 28, 2015, Mrs. Dougall emailed High School Counselor Jennifer Morganti to advise her that A.D. would be entering the ninth grade in the fall and had recently been diagnosed with autism.  (A.R. 3665.)  Mrs. Dougall indicated "we have the results of [A.D.'s] academic testing [and were] not sure how we should proceed with informing the High School of her special needs."  (*Id*.)  She requested a meeting to "talk with you about our concerns for [A.D.] for next year."  (*Id*.)  Mrs. Dougall emailed High School Principal Kathy Ashcroft several days later, also advising of A.D.'s autism diagnosis.  (A.R. 3599.)

A meeting was held with Mr. and Mrs. Dougall, Ms. Morganti and High School Psychologist Caitlyn Kowalski on June 4, 2015.   (A.R.  1517, 1600 (Tr. 304-305, 475)).  It is undisputed that the Dougalls brought Dr. Baker's assessment to this meeting and provided a copy to Ms. Morganti and Ms. Kowalski. (A.R.  1518 (Tr. 307)).   During this meeting, the Dougalls discussed the results of Dr. Baker's assessment and talked about their concerns regarding A.D.'s social and emotional well-being.  (A.R. 2769 (Tr. 3455)).  Mrs. Dougall testified that they specifically advised the school that A.D. had been severely bullied during the eighth grade.[9]  (A.R. 2046 (Tr. 1672)).  The Dougalls

---

[9] Ms. Morganti testified that she did not recall the Dougalls advising them that A.D. had been bullied. (A.R. 1518 (Tr. 309-310).  In her Findings of Fact, the IHO found that "[o]n June 4, 2015, Parents told Ms. Kowalski and Ms. Morganti that Student was bullied."  (A.R. 978.)  The Court notes that it is undisputed that, on June 4, 2015, the Dougalls provided Ms. Morganti and Ms. Kowalski with a copy of Dr. Baker's assessment.  In that assessment, Dr. Baker notes (among

requested that the school avoid scheduling A.D. in classes with certain students. (A.R. 1518 (Tr. 308-309)). The Dougalls also requested that it would be helpful in alleviating A.D.'s anxiety if she were able to get up and walk around in class as necessary. (A.R. 1524, 2770 (Tr. 331, 3457)).

Ms. Morganti testified that, during this meeting, neither she nor Ms. Kowalski provided any information to the Dougalls regarding special education services, the IDEA evaluation process, or the possibility that A.D.'s autism, depression, and/or anxiety might be considered a "disability." (A.R. 1521 (Tr. 322)). Rather, Ms. Morganti indicated that the she talked with the Dougalls about (1) communicating with the teachers regarding their concerns; (2) meeting with them again prior to the beginning of the school year to help with the transition; and (3) "staying in touch if there were any concerns that were presented once the school year had started and having [A.D.] access the guidance office as needed." (A.R. 1524 (Tr. 331)). She testified that the June 2015 meeting did not cause her to believe that A.D. had any need for special education services, explaining as follows:

> The information that we gathered was just-- it did not present the situation where we felt there was any type of real educational impact from whether it's the anxiety or the depression or any of the things noted in the evaluation, the autism. And that really was what we were trying to gather at that time, you know, how is this impacting her at school and what do we need to be prepared for coming into ninth grade. And there was nothing -- I mean there were good things to be aware of and good things for the teachers to know, but it wasn't anything that we felt was significantly impacting her ability, you know, to learn at school.

(A.R. 2770 (Tr. 3458)).[10]

---

other things) that A.D. "has experienced significant maltreatment from peers" and "significant bullying" at school. (A.R. 3775, 3781.)

[10] Ms. Kowalski testified similarly. She stated that, while the Dougalls shared A.D.'s diagnoses during the June 2015 meeting, they did not indicate any "educational impact" that might have necessitated evaluation for an IEP. (A.R. 1929 (Tr. 1352-1353)). Ms. Kowalski further testified that the Dougalls did not raise any concerns regarding lack of focus, anxiety, or problems with socialization. (A.R. 1930-1931 (Tr. 1355, 1359)).

Over the summer, A.D. joined the high school cross country team but experienced gastrointestinal issues and stress. (A.R. 3079-3080). Both Mr. and Mrs. Dougall emailed A.D.'s cross country coach, Nathan Cropper, at various points in June and July 2015 and advised him that A.D. (1) had "recently been suffering from high anxiety" for which she was taking medication: (2) had been diagnosed with autism; and (3) suffered from asthma.[11] (A.R. 3079-3080, 3596-3598.)

On July 23, 2015, Mrs. Dougall emailed Ms. Morganti and provided her with a list of additional students "that have caused problems for her last year that [A.D.] would like to strongly avoid." (A.R. 3671.) She also advised Ms. Morganti regarding A.D.'s struggles in cross country and indicated that "any input from you or Caitlyn Kowalski regarding her course load with Marching Band and [cross country] with her [diagnosis] background would be very helpful." (*Id*.)

On August 11, 2015, Ms. Morganti acknowledged the list of student names and indicated that she would make every effort to accommodate the Dougalls' wishes. (A.R. 3672.) Mrs. Dougall responded via email that same day and indicated that A.D. had decided to "hold off" on cross country. (A.R. 3673.) She noted, however, that A.D. was having a "positive experience with band," despite the fact that she had a "rough first day at band camp." (*Id*.) Mrs. Dougall indicated that A.D. decided to participate in the band Color Guard and had been "doing well." (*Id*.) She requested the opportunity for A.D. to meet with Ms. Morganti prior to the beginning of the school year. (*Id*.) A.D. and Mrs. Dougall thereafter had a meeting with Ms. Morganti in mid-August to discuss scheduling and to provide an opportunity for A.D. to become familiar with the high school guidance office. (A.R. 1800-1801, 2771 (Tr. 1002-1003, 3463)).

---

[11] The school implemented an "Asthma Action Plan" for A.D. in November 2013, when she was in the seventh grade. (A.R. 3769-3770.)

Mr. and Mrs. Dougall testified that, at this point in time, nobody from CFCSD had ever explained to them what an IEP was or discussed with them the possibility that A.D. might be eligible for special education services. (A.R. 1706, 2023-2024, 2110 (Tr.754-755, 1581-1582, 1770-1772)). Mr. and Mrs. Dougall both testified that, prior to November or December of A.D.'s ninth grade year, they did not, in fact, know what an IEP was, nor were they aware that A.D. could possibly have been eligible for one. (*Id.*)

C.    **Ninth Grade**

A.D.'s teachers testified that they did not notice any significant academic or behavioral issues relating to A.D. during the first six weeks of A.D.'s ninth grade year (i.e. late August through mid-October 2015). A.D's U.S. history teacher, Heather Estright, testified that A.D. seemed to her to be a "normal freshman girl." (A.R. 2234 (Tr. 2071)). Ms. Estright explained that A.D. was "performing well" academically, had friends, and did not seem reluctant to come to class. (A.R. 2234-2235 (Tr. 2071-2074)). She further testified that she did not notice any signs of depression or anxiety and did not have any concerns regarding A.D.'s socialization. (A.R. 2235 (Tr. 2074)). Ms. Estright indicated that she did not observe anything that suggested that A.D. needed special education services. (A.R. 2235 (Tr. 2076)).

 A.D.'s honors physical science teacher, Brian Falhamer, testified that A.D. was doing "really well" in his class, even noting that the work she turned in had been "stellar." (A.R. 2263-2264 (Tr. 2186, 2191)). He did not observe that A.D. had any difficulty working in groups or with her lab partners. (A.R. 2264 (Tr. 2190-2191)). Mr. Falhamer testified that he did not observe that A.D. had any signs of anxiety, depression, or difficulty focusing; and he had no concerns about her interactions with her peers. (A.R. 2265 (Tr. 2195)). He stated that A.D. had an A in his class at the end of the

first quarter, and he did not observe anything that would suggest A.D. needed special education services. (A.R. 2263, 2265 (Tr. 2186, 2195-2196)). *See also* A.R. 3277. A.D.'s honors math teacher, Michelle Flanagan, likewise testified that she did not observe any depression or anxiety and did not suggest that A.D. needed to be evaluated for special education services. (A.R. 2253, 2261 (Tr. 2148, 2178-2179)). She indicated that A.D. was maintaining a B in the class at the end of the first quarter. (A.R. 2258 (Tr. 2166)). *See also* A.R. 3277.

Meanwhile, in or around September 2015, the Dougalls enrolled A.D. in a six-week social skills and anxiety management course at Akron Children's Hospital, which she completed in mid-October 2015. (A.R. 2109 (Tr. 1768)).

On October 12, 2015, a student handed a folded piece of paper to Ms. Estright that appeared to outline a plan to shoot six students at the school. (A.R. 2231 (Tr. 2060)). This "shooting plan" listed the names of six CFCSD students who were to be shot, including A.D. (A.R. 3139). The note stated that "we will be stealing my dad's hunting gun (whatever's smallest)" and "remember there is no turning back. . . this is a suicide mission." (*Id.*) The note contained a map of the school and indicated "go to band with gun, shoot as many on above list as possible." (*Id.*)

The school immediately commenced an investigation. On October 13, 2015, A.D. admitted to writing the shooting plan. (A.R. 3140.) She wrote the following confession:

> I wrote a fake note to get attention of girls and to cry out for help that I am a pathological liar. That counseling does not help me. That I have two sides and I'm hurting. I need help and I thought of this note to get a quick cry out. To distract myself from my pain.

(A.R. 3140). On that same date, she was suspended from school for ten days with a recommendation for expulsion.[12] (A.R. 3141.) A.D. was arrested by the police on charges of Inducing Panic and Aggravated Menacing, and transported to the Copley Police Department and, later, the Summit County Juvenile Detention Center. (A.R. 3148.)

On October 14, 2015, the Dougalls executed a release to allow CFCSD to obtain A.D.'s medical records from the Akron Children's Hospital. (A.R. 3457.) The following week, on October 21, 2015, the Dougalls, through counsel, sent a letter to Defendant Brian Poe, the Superintendent of CFCSD. (A.R. 3741.) This letter referenced A.D.'s autism, anxiety and adjustment disorder diagnoses and stated that "we believe that the behavior that led to the suspension and the potential expulsion was a manifestation of her disability as described above." (*Id.*) The Dougalls requested a Manifestation Determination pursuant to 20 U.S.C. § 1415[13] and asked CFCSD to "convene an IEP team as determined by [A.D.]'s parents and appropriate representatives of the Copley-Fairlawn Schools." (*Id.*)

---

[12] The school issued a "Notice of Intent to Suspend" on October 13, 2015, which stated as follows: "A threatening note was found in a classroom on 10-12. The discovery of the note created a large disruption in the school requiring the involvement of law enforcement, community, and the media. After a thorough investigation with evidence, [A.D.] admitted to writing the note. [A.D.] stated that she wrote the note as a cry for help to gain attention and friends." (A.R. 3141.)

[13] "Prior to taking disciplinary action against a child with a disability, the school must conduct a 'manifestation determination' during which the student's parents and educators consider the relevant information in the student's file, as well as information provided by teacher observations and the parents, to determine whether the conduct at issue 'was caused by, or had a direct and substantial relationship to, the child's disability' or 'was the direct result of the local educational agency's failure to implement the IEP.'" *Jackson v. Northwest Local School Dist.*, 2010 WL 3452333 at * 9 (S.D. Ohio Aug. 2010) (citing 20 U.S.C. § 1415(k)(1)(E)), *adopted by* 2010 WL 3474970 (S.D. Ohio Sept. 1, 2010). If the child's behavior is determined to be a manifestation of his or her disability, the child must be restored to his or her regular education program. *Id. See* 20 U.S.C. § 1415(k)(1)(F). If not, then the school may discipline the child as it would any other non-disabled student. *Id. See* 20 U.S.C. § 1415(k)(5)(D)(i). *See also* 20 U.S.C. § 1415(k)(5)(A) (providing that "[a] child who has not been determined to be eligible for special education and related services under this subchapter and who has engaged in behavior that violates a code of student conduct, may assert any of the protections provided for in this subchapter if the local educational agency had knowledge ... that the child was a child with a disability before the behavior that precipitated the disciplinary action occurred").

14

From October 15, 2015 through October 30, 2015, A.D. was treated in Akron Children's Hospital's Full Day Partial Hospitalization Program for mental health. (A.R. 3591, 3417.) On October 22, 2015, A.D.'s psychiatrist Sumru Bilge Johnson, M.D., wrote a letter indicating that A.D. had been diagnosed with Depressive Disorder, Generalized Anxiety Disorder, Social Phobia, and Autism Spectrum Disorder. (A.R. 3591.) Upon her completion of the program, one of her providers, Licensed Professional Clinical Counselor ("LPCC") Megan Ott, wrote a letter setting forth several suggestions for accommodations that could be implemented to support A.D., and stated that she believed "it would be helpful if [A.D.] were evaluated for a 504 plan and/or IEP to most effectively attended to her specialized educational needs."[14] (A.R. 3417.)

An expulsion hearing was conducted on October 28, 2015, at which numerous witnesses testified, including A.D. (A.R. 245-276.) As a result of this hearing, A.D. was expelled from school for 80 days, with 60 days held in abeyance with the following conditions: "(1) [A.D.] will continue with her Partial Hospitalization and Intensive Outpatient Program at parent expense and will return at its completion or no later than December 2, 2015; (2) [A.D.'s] mental health practitioner must provide assurances to me that [A.D.] does not present a threat to herself, or others, and is fully capable of resuming her education in our setting; (3) [A.D.] and her parents will follow any recommended course of treatment/counseling (again, at parent expense) recommended by her mental health practitioner and provide the district with a release to speak directly with this professional during any course as such treatment or counseling continues and to plan for [A.D.'s] entry into the school environment." (A.R. 3158-3159.)

---

[14] A.D. thereafter engaged in intensive outpatient treatment at Akron Children's Hospital from October 29 through November 24, 2015. (A.R. 1710 (Tr. 770)).

On November 5, 2015, the Dougalls withdrew A.D. from CFCSD and enrolled her in Our Lady of the Elms, a private parochial school located in the Akron City School District.

The Dougalls appealed A.D.'s expulsion. (A.R. 3160, 3163.) An expulsion appeal hearing was conducted on November 17, 2015. (A.R. 277-310.) At this hearing, the Dougalls, through counsel, requested that CFCSD rescind the expulsion and conduct a multi-factored (or evaluation team) report regarding A.D. (A.R. 279 (Tr. 7-8)). On that same date, the Dougalls made this same request in writing. (A.R. 3583.) At that time, the Dougalls also revoked any consent for records or other items and communications that the parents had previously executed. (*Id.*)

On November 19, 2015, the CFCSD upheld A.D's expulsion. (A.R. 3615.)

On November 30, 2015, the Dougalls filed a Due Process Complaint and Request for Due Process Hearing. (A.R. 3109-3110.) Among other things, this Complaint alleged that (1) the school failed to identify, locate, and evaluate A.D. as a child with disabilities despite having documentation and knowledge of her disabilities; and (2) the school failed to provide A.D. with a free and appropriate public education ("FAPE") by not providing her with an Evaluation Team Report ("ETR") and an IEP despite having knowledge of her disabilities.[15] (A.R. 3110.)

---

[15] The record reflects that, on January 2, 2016, Plaintiffs filed (in the administrative proceedings below) a Motion to Amend Due Process Complaint. (A.R. 55-59.) It is unclear, but it appears that Plaintiffs withdrew this Motion in February 2016. (A.R. 102.) On February 4, 2016, Plaintiffs filed a pleading captioned "Clarification of Issues," which set forth the specific issues that Plaintiffs sought to raise at the Due Process Hearing. (A.R. 106-107.) These issues included (1) whether A.D. was denied a FAPE; (2) whether the school violated child find; (3) whether the school failed to protect A.D. from bullying; (4) whether A.D. missed out on educational opportunities due to the school's failure to provide her with FAPE; and (5) whether the school failed to follow certain procedural requirements. (*Id*.)

On December 7, 2015, CFCSD (through high school psychologist Ms. Kowalski) emailed the Dougalls an invitation to an ETR planning meeting to be held on December 9, 2015.[16] (A.R. 3558.) After receiving no response, a second invitation was emailed to the Dougalls on December 8, 2015. (A.R. 3559.) *See also* A.R. 1934 (Tr. 1371-1373). CFCSD Director of Pupil Services Heather Doyle testified regarding the difficulties encountered in scheduling this meeting;

> There were some scheduling - there were some scheduling issues. We contacted parents by phone a couple of times and then by e-mail and maybe by mail. And then we received communication through [counsel for CFCSD] from [the Dougall's attorney] Mr. Wallace that [the Dougalls] weren't able to attend the meeting on the date that we proposed. *** On the parent invitation that we send out, on two different occasions I believe, there's a place on there where a parent could suggest another time and date for an evaluation. We didn't receive any suggestions for dates. And then we had a mediation scheduled for December - I believe it was December 14. And then we agreed to conduct the planning meeting then and obtain consent at that date since we had the necessary parties here in order to do that.

(A.R. 2749 (Tr. 3374-3375)).

The ETR planning meeting was conducted on December 14, 2015 and attended by Mr. Dougall, two of the Dougalls' lawyers, Dr. Doyle, and an attorney for CFCSD. (A.R. 3115-3116; A.R. 1749 (Tr. 929).) Mr. Dougall testified that "[w]e did not know this meeting was happening on December 14 until December 14." (A.R. 1749 (Tr. 929)). He explained that, when he (and his two attorneys) decided to go forward with the planning meeting, Mrs. Dougall had already left. (*Id*.) Thus, Mrs. Dougall did not participate in the planning meeting. (*Id*.)

Dr. Doyle testified that, during the planning meeting, she discussed with Mr. Dougall and his attorneys the various disability categories identified in the IDEA. (A.R. 2751 (Tr. 3381-3383)). She

---

[16] Dr. Doyle testified that CFCSD decided to initiate the evaluation process because the Dougalls had advised CFCSD that A.D. would be returning to Copley-Fairlawn after the completion of her expulsion period. (A.R. 3284; A.R. 1665 (Tr. 735)).

also testified that she explained how the evaluation would be conducted and discussed the types of assessments and tests that would be used, the types of other information that would be gathered, and the staff who would be conducting the tests and assessments and gathering the information. (A.R. 2751-2756 (Tr. 3383-3401)). Dr. Doyle testified that, during this meeting, it was expressly discussed and agreed that testing and observations would need to occur at Our Lady of the Elms as part of the evaluation. (A.R. 2756 (Tr. 3403)). [17]

The ETR Planning Form indicated it was an initial evaluation and identified A.D's suspected disabilities as autism, emotional disturbance, and other health impairment. (A.R. 3115.) The form indicated that CFCSD did not have "information provided by the parent" or "classroom based evaluations and progress in the general curriculum." (*Id*.) With regard to the latter category, the form indicated that this information would be obtained from "general education teachers at Copley and the Elms and the school psychologist." (*Id*.) It also indicated that CFCSD did not have data available regarding A.D's "communicative status" and stated this information would be obtained by a speech language patholo gist. (*Id*.) At the conclusion of the meeting, Mr. Dougall signed the Parent Consent

---

[17] The December 14, 2015 planning meeting was secretly recorded. Dr. Doyle testified that she was not aware that the meeting was being recorded and did not know who had recorded it. (A.R. 2943-2944 (Tr. 3932-3933)). Counsel for Plaintiffs was resistant to identifying who made the recording, arguing it was not relevant. (A.R. 2944-2945 (Tr. 3934-3938)). He acknowledged it did not capture the entire meeting, but asserted it only failed to include "a few minutes or so" of the beginning of the meeting. (A.R. 2944-2946 (Tr. 3932-3942)). Counsel for CFCSD objected to the recording on numerous grounds. (*Id*). The record reflects the IHO listened to the audio recording; however, the content of the recording does not appear to be reflected in the Transcript of the Due Process Hearing. (*Id*). Moreover, it does not appear that this audio recording (referred to as Petitioner's Exh. 20) was admitted into evidence by the IHO. (A.R. 969-970.) In the instant action, a disc containing the audio recording of the December 14, 2015 meeting was filed by the Ohio Department of Education ("ODE") on September 9, 2019 as part of the Administrative Record. (Doc. No. 52.) Both parties cite to this recording in their briefing before this Court. (Doc. No. 55-1 at p 20, fn 8; Doc. No. 51 at p. 17.) As neither party objected to the Court's consideration of this audio recording in these proceedings, the Court listened to the recording as part of its review. However, it was often very difficult to hear the parties speaking on the recording and, further, to identify who was speaking at any given time. Moreover, the recording does not appear to have captured the entirety of the meeting. Thus, the Court found the recording to be of limited value.

for Evaluation.[18]  (A.R. 3115-3116.)  The following day, Dr. Doyle sent to the Dougalls a Prior Written Notice acknowledging that CFCSD was initiating an evaluation of A.D.  (A.R. 3557.)

Shortly thereafter, on December 18, 2015, Ms. Kowalski contacted the Principal of Our Lady of the Elms, Cynthia Wilhite, and left a voicemail requesting to arrange testing and observation as part of the ETR process.  (A.R. 3119.)  Ms. Wilhite returned the call and proposed dates for classroom observation were discussed.  (*Id.*)  On December 29, 2015, Dr. Doyle sent the Dougalls an evaluation packet that included several forms and questionnaires and record release forms for Dr. Baker.  (A.R 1943 (Tr. 1406-1408)).

On January 5, 2016, Mr. Dougall executed a records release that allowed CFCSD to engage in communication with Our Lady of the Elms regarding A.D. in order to complete an evaluation to determine eligibility for special education services. (A.R. 3443.)  On the portion of the form indicating the types of communication and information that could be shared, Mr. Dougall checked the boxes for "cumulative records (including attendance and discipline records from Our Lady of the Elms" and "transcripts/report cards/grades." (*Id.*) However, Mr. Dougall did not check the boxes on the form granting permission for the release of several other categories of information, including "interviews with teachers and school personnel," or "data from classroom-based evaluations and progress in the general education curriculum."  (*Id.*)  Mr. Dougall also did not indicate permission for CFCSD to conduct observations in A.D.'s classrooms at Our Lady of the Elms.  (*Id.*)  At the

---

[18] Specifically, Mr. Dougall agreed to and signed the following: "I HEREBY GIVE PERMISSION FOR [A.D.] to receive an evaluation(s) by designated personnel.  I understand the evaluation information will be shared by teachers, principals, and other appropriate school personnel, and that the school district will forward educational records upon request to another school district or educational agency in which my child seeks or intends to enroll.  I further understand that my granting of consent is voluntary on my part and I may revoke my consent at any time. I have received a copy of my procedural safeguards and I understand the information provided."  (A.R. 3116.)

bottom of the form, he wrote as follows: "If you need specific information on the other items above, please let us know and we will help facilitate it." (*Id.*)

On January 7, 2016, CFCSD speech and language pathologist Christine Regueiro arrived at Our Lady of the Elms to conduct an assessment of A.D. (A.R. 3622.) A.D. advised Principal Wilhite that she believed she was not supposed to speak to anyone from CFCSD and declined the evaluation. (*Id.*) Ms. Wilhite spoke to Mr. Dougall, who gave his consent for the evaluation. (*Id.*) The following day, January 8, 2016, Ms. Kowalski met with A.D.'s teachers at Our Lady of the Elms to explain the evaluation process. (*Id.*) An observation of A.D. was scheduled for January 13 and 14, 2016.[19] (*Id.*)

On January 13, 2016, Ms. Kowalski arrived at Our Lady of the Elms to conduct an observation. (A.R. 3622.) She was informed that the Dougalls had removed A.D. from school that day. (*Id.*) On that same date, counsel for CFCSD, Giselle Spencer, emailed counsel for the Dougalls, Jason Wallace, and noted that the "parents' executed consent will not permit staff at the Elms to complete rating scales, permit observations, or interviews." (A.R. 3543.) Ms. Spencer also noted that "the parents have not returned the packet with the rating scales that were due on January 8th." (*Id.*) She stated that "these issues along with your mandate that the District can't speak to parents directly to resolve these concerns . . . are making it impossible to complete the [Multi-Factored Evaluation or 'MFE']." (*Id.*)

---

[19] On January 11, 2016, A.D. underwent a neuropsychological evaluation with clinical neuropsychologist Dalin Pulsipher, Ph.D. (A.R. 3081-3085.) Dr. Pulsipher found that A.D. showed weaknesses in the areas of sustained attention, verbal memory retrieval, and non-verbal executive functioning. (A.R. 3084.) He assessed a mild neurocognitive disorder but did not diagnose A.D. with Attention Deficit Hyperactivity Disorder ("ADHD.") (*Id.*) Dr. Pulsipher offered several recommendations to support A.D. in the school setting, including (1) additional assistance in math; (2) preferential seating close to her teachers and away from disruptive peers; (3) shorter work periods interspersed with more breaks; (4) avoiding changes or disruptions in routines; and (5) presenting new nonverbal information with an accompanying verbal explanation. (*Id.*)

Mr. Wallace responded via email that "we do not want personnel from Copley coming to the Elms because of the breakdown in trust between the District and the parents, nor do we want the District interacting with Elms personnel." (A.R. 3542-3543.) Additionally, Mr. Wallace stated "we do not want people interacting with [A.D.] who would bring up old memories and potentially re-traumatize her." (*Id.*) He inquired "are there any available options to get an MFE done without having the District staff interact with the Elms or [A.D.] anymore?" (A.R. 3542.)

On January 18, 2016, Mr. Dougall revoked his consent, as follows: "We are revoking all releases executed by us to Copley Fairlawn School District concerning [A.D.]" (A.R. 3547.) On that same date, Mr. Wallace sent the following email to Ms. Spencer:

> We are willing to provide some data to the school to assist with the MFE. However, the school cannot have access to anything without the parents' consent and we do not want the school interacting with the Elms due to the distrust that has developed since the Due Process Hearing began and the school began to lie about things.
>
> Please let me know what data is requested from the school, what is required and not simply wanted, and how we can help get the evaluation completed without bothering [A.D.] at the Elms or causing her any issues or set back with treatment. Also, while we will not release all medical info, we are willing to produce [A.D.] for a medical evaluation.

(A.R. 3546.) Ms. Spencer responded the next day and asked: "are [the Dougalls] revoking consent for the evaluation, or releases for the following: to speak to Elms staff, to obtain records and information from the Elms, and to obtain records and information from the Student's providers; or are they revoking all of it?? Your narrative suggests that we can't observe, or obtain records/information, or test." (A.R. 3546.) Mr. Wallace replied that "as of this moment, we are revoking all releases executed by the Dougalls." (A.R. 3545.)

The next day, Mr. Wallace advised Ms. Spencer that "we are revoking all releases for everything." (A.R. 3548.) He stated that "we do consent to an evaluation but will take the testing

and other things the district wants to do on an item by item basis." (*Id*.) Mr. Wallace asked Ms. Spencer to "let us know what the District deems as 'required' versus what the District simply wants." (*Id*.) Several days later, on January 22, 2016, Mr. Wallace emailed Ms. Spencer to inquire "how the family can get an ETR completed for [A.D.] without giving up unfettered access to her medical records and without setting her back in her treatment anymore." (A.R. 3551.)

On January 27, 2016, CFCSD issued a Prior Written Notice to the Dougalls, in which it indicated that "based on [the Dougalls'] revocation of consent, [the] District will not continue with or finalize the MFE of [A.D.] unless and until full consent is reinstated." (A.R. 3622.) CFCSD explained as follows:

> The District is prepared to conduct a full MFE as outlined in the evaluation planning form. In order to complete the MFE, it is necessary for District to complete direct testing in such areas as academics, pragmatic communication, and cognitive abilities, as well as observe [A.D.] in her school environment and obtain input from [A.D.'s] current teachers. Parents' revocation of all releases executed for District amounts to a withdrawal of consent to conduct the MFE. Accordingly, District will not move forward with any observations or testing of [A.D.] and has directed the Principal at Elms to maintain any ratings forms completed by teachers prior to the revocation until further notice. Moreover, the District cannot schedule the ETR. Should Parents reinstate consent for an MFE and authorize the necessary observations, testing, communications, and exchange of information, District is willing to proceed with the MFE and ETR.

(A.R. 3623.) The Notice also stated that the "District was prepared to discuss the option of having the MFE conducted by Akron City School District as the district of service for students at Elms in compliance with the [IDEA]." (*Id*.) However, "parents refused to meet with the District" to discuss this option. (*Id*.)

On February 11, 2016, Mr. Wallace sent a letter to Ms. Spencer to "see what my clients need to do in order for their daughter to receive a multi-factored evaluation (MFE) from Copley-Fairlawn." (A.R. 3540.) He noted "we have revoked all releases that provide the school with unfettered access

to her records, medical care, or providers, and her new school, but we did not revoke consent for an MFE to be completed." (*Id.*) Mr. Wallace argued that, during the December 14, 2015 meeting, Dr. Doyle failed to adequately explain the evaluation process to Mr. Dougall and, therefore, he did not give informed consent.[20] (*Id.*)

During the Due Process Hearing, Dr. Doyle indicated that, because Our Lady of the Elms is located in the Akron Public School District, "technically it would be Akron Public Schools that would be responsible for identifying . . . students with disabilities at the Elms." (A.R. 1665 (Tr. 734-735)). She acknowledged, however, that "there are cases where the district of residence does do the ETR."[21] (*Id.*)

## II.     Procedural Background

### A.     Administrative Proceedings

As noted above, Plaintiffs filed a Due Process Complaint and Request for Administrative Hearing on November 30, 2015. (A.R. 3109-3110.) Thereafter, on February 4, 2016, Plaintiffs filed a pleading captioned "Clarification of Issues" that set forth the specific issues that Plaintiffs sought to raise at the Due Process Hearing. (A.R. 106-107.)

---

[20] On that same date, the State of Ohio, Opportunities for Ohioans with Disabilities, determined that A.D. was eligible for vocational rehabilitation services. (A.R. 3552.) The State found that A.D.'s disabilities seriously limited her in the areas of interpersonal skills and work tolerance. (*Id.*) Based on these limitations, the State offered to provide A.D. with vocational counseling and guidance. (*Id.*) In addition, the State indicated that it expected A.D. would need additional vocational services, including job development and placement; transition services; and job readiness training. (*Id.*)

[21] Dr. Doyle explained that CFCSD would be open to doing an MFE or ETR for A.D. but explained: "There just seems to be – it's been communicated there's a lot of distrust, I guess, with the school district and also concern for the school district negatively affecting the relationships that [A.D.] has with her teachers at the Elms. Therefore, that's why we have – since Akron Public Schools is the district of service and an option for completing the evaluation, they have had no involvement at all with this whole situation, that's why we brought – we brought that up." (A.R. 1666 (Tr. 738-739)).

On February 11, 2016, the Independent Hearing Officer ("IHO") issued an Order identifying the following issues for determination at the Due Process Hearing: "(1) Was Student denied a free, appropriate public education, or FAPE?; (2) Did School District fulfill its responsibilities to Student regarding the child find process? (3) Was Student deprived of educational opportunities, accommodations, or related services? (4) Did School District fail to follow procedural requirements following a request by Petitioners for a multi-factored evaluation of Student?" (A.R. 181.)

The Due Process Hearing took place over 22 non-consecutive days between February and September 2016. (A.R. 1406-3066.) Eighteen witnesses testified, including the Dougalls, Dr. Doyle, Ms. Kowalski, Ms. Morganti, Mr. Cowie, Ms. Sako, Mr. Green, Mr. Virgei, Ms. Flanagan, Mr. Falhamer, Ms. Estright, Ms. Simenc, and Ms. Wilhite. (*Id.*) The hearing transcript is 4,133 pages in length, and over 70 exhibits were admitted. (*Id.*) *See also* A.R. 969-970. Post-hearing briefs were submitted by both parties. (A.R. 749-782, 784-819, 824-835, 838-921.)

The IHO issued a 37-page written decision on November 16, 2016. (A.R. 965-1001.) Therein, the IHO found in favor on the CFCSD on all issues. (*Id.*) Specifically, the IHO concluded that (1) Mr. Dougall gave informed consent to conduct a MFE on December 14, 2015; (2) A.D. was not denied educational opportunities; (3) CFCSD did not have knowledge that A.D. was a child with disability at any time prior to February 12, 2016; (4) A.D. is not a child with a disability under the IDEA; and (5) CFCSD did not violate its child find requirements with respect to A.D. (A.R. 1000-1001.)

The Dougalls filed a Notice of Appeal on December 18, 2016. (A.R. 1007-1009.) A State Level Review Officer ("SLRO") was appointed on December 20, 2016, and briefs were submitted in February and March 2017. (A.R. 1112-1200, 1203-1229, 1230-1249.) The SLRO issued his decision

on May 11, 2017.  (A.R. 1388-1394.)  After conducting a *de novo* review, the SLRO found in favor of CFCSD on all claims.[22]  (*Id.*)

### B.  Proceedings in this Court

On August 8, 2017, Plaintiffs in their own capacities and as natural guardians of A.D., a minor, filed a Complaint in this Court against the CFCSD Defendants and the Ohio Department of Education ("ODE"), seeking judicial review of the administrative decisions below.  (Doc. No. 1.)  In the Complaint, Plaintiffs state various claims under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132; the Individuals with Disabilities Education Act ("IDEA"), 42 U.S.C. §§ 1401 *et seq.*; and 42 U.S.C. § 1983.  (*Id.*)  Plaintiffs seek a compensatory education; compensatory and consequential damages; a permanent injunction; pre- and post-judgment interest; and attorneys' fees and costs.  (*Id.*)  Plaintiffs also seek an order reversing the adverse administrative decisions of the IHO and SLRO, below.  (*Id.*)

Defendant ODE filed an Answer and Motion for Judgment on the Pleadings on November 6 and November 8, 2017, respectively, and the CFCSD Defendants filed their Answer on December 1, 2017.  (Doc. Nos. 18, 19, 20.)

On March 7, 2018, the parties stipulated to the dismissal without prejudice of Plaintiffs' claims against Defendant ODE pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii).  (Doc. No. 31.)  On March 9, 2018, then-assigned District Judge Sara Lioi ordered that Defendant ODE and Count IV of the

---

[22] The Court notes that the Dougalls also filed a Due Process Complaint alleging that the CFCSD Defendants violated the IDEA by not conducting a Manifestation Determination Review ("MDR") before expelling A.D. in October 2015.  In the administrative proceedings relating to that complaint, the SLRO found in favor of the CFCSD Defendants. The Dougalls appealed to the Summit County Court of Common Pleas, which affirmed the decision of the SLRO on August 15, 2017. *See Dougall v. Copley-Fairlawn City School District Board of Education*, Case No. CV-2016-10-4208 (Breaux, J.)  The Dougalls appealed to the Ninth District Court of Appeals of Ohio.

Complaint be dismissed without prejudice.  *See* Non-Document Order dated March 9, 2018.  Judge Lioi also adopted the parties' proposal that Plaintiffs' Rehabilitation Act, ADA, and § 1983 claims (as set forth in Counts V, VI, VII and VIII) be stayed until Plaintiffs' IDEA claims (as set forth in Counts I, II and III) are resolved.  (*Id*.)  Judge Lioi then set briefing deadlines relating to Counts I, II, and III.  (*Id*.)  Plaintiffs later noted that Count I does not state an IDEA claim and asked that it, also, be stayed.  (Doc. No. 44.)  The Court agreed, and stayed Count I, in addition to Counts V, VI, VII, and VIII.  *See* Non-Document Order dated March 29, 2019.

Meanwhile, on April 16, 2018, pursuant to an Order of the Court, the ODE filed the Administrative Record in this action under seal.  (Doc. No. 34.)  The following month, Plaintiffs filed a Motion for Leave to File Supplemental Exhibits under Seal, which the CFCSD Defendants opposed.  (Doc. Nos. 36-1, 37, 39.)  On March 18, 2019, Judge Lioi issued a Memorandum Opinion and Order denying Plaintiffs' Motion with the caveat that, following the Court's review of Plaintiffs' IDEA claims (set forth in Counts II and III of the Complaint), "should any party desire to supplement the record with any additional documents relevant to the merits of the claims in Counts V- VIII, the Court will entertain (although it is not inviting) an appropriate, timely motion setting forth good cause for limited supplementation."  (Doc. No. 42 at p. 10.)

Plaintiffs filed a Motion for Judgment on the Administrative Record regarding Counts II and III on May 8, 2019.  (Doc. No. 46.)  On June 7, 2019, Judge Lioi issued an Order directing Plaintiffs to refile their motion using the specific citation format to the Administrative Record set forth in her Order.  (Doc. No. 47.)  In that Order, Judge Lioi directed Defendants to follow the same manner of citation in their opposing Brief.  (*Id*. at p. 3.)

Plaintiffs filed their Amended Motion for Judgment on the Administrative Record regarding Counts II and III on June 19, 2019. (Doc. No. 49.) The CFCSD Defendants filed their Brief in Opposition (Doc. No. 50), to which Plaintiffs replied on August 20, 2019 (Doc. No. 51.)[23]

## III. Statutory Framework

"The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1482, offers state governments federal funding to help educate children with disabilities." *Gibson v. Forest Hills Local School Dist. Bd. of Educ.*, 655 Fed. Appx. 423, 426 (6th Cir. 2016) (citing 20 U.S.C § 1411(a)(1)). In exchange for those funds, participating states must adopt policies and procedures that implement the Act's promise of making a FAPE available to every eligible child. *See* 20 U.S.C. § 1412(a)(1)(A). Ohio has opted to receive IDEA funds. *See Gibson*, 655 Fed. Appx. at 426 (citing *Bd. of Educ. of Austintown Local Sch. Dist. v. Mahoning Cty. Bd. of Mental Retardation & Developmental Disabilities*, 613 N.E.2d 167, 172 (Ohio 1993)).

Under the IDEA, states must establish policies and procedures to ensure that children with disabilities are identified, located, and evaluated. 34 C.F.R. § 300.111(a)(1)(i). This is known as the "child-find" requirement. *See M.G. by and through C.G. v. Williamson County Schools*, 720 Fed. Appx. 280, 284 (6th Cir. 2018). To fulfill their child-find obligation, states must ensure that their schools take appropriate steps to identify and evaluate "[c]hildren who are *suspected* of being a child with a disability ... and in need of special education, even though they are advancing from grade to grade." 34 C.F.R. § 300.111(c)(1) (emphasis added). *See also M.G.*, 720 Fed. Appx. at 284; *Bd. of*

---

[23] Although expressly ordered to do so by Judge Lioi, neither party correctly cited to the Administrative Record. (Doc. No. 47.) Pursuant to an Order dated January 13, 2020, the CFCSD Defendants resubmitted their Brief in Opposition with correct citations to the Administrative Record. (Doc. No. 55-1.) In addition, and also pursuant to this Court's January 13, 2020 Order, Plaintiffs submitted corrected case citations and hard copies of cases citing to specialized reporters. (Doc. No. 56.)

*Educ. of Fayette Cty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007) ("Even children who are only suspected of having a disability, although they are progressing from grade to grade, are protected by this requirement."). To establish a violation of the child-find requirement, a plaintiff "must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate." *L.M.*, 478 F.3d at 313 (quoting *Clay T. v. Walton Cty. Sch. Dist.*, 952 F. Supp. 817, 823 (M.D. Ga. 1997)).

"The lynchpin of the IDEA is a document known as the 'individualized educational program' ('IEP')." *Gibson*, 655 Fed. Appx. at 426 (citing *Honig v. Doe*, 484 U.S. 305, 311–12 (1988)). Each academic year, an "IEP Team" comprising an eligible child's parents, her teachers, a representative of the local educational agency, and, whenever appropriate, the child herself, meets to discuss the child's progress and educational goals. 20 U.S.C. § 1414(c)(1), (d)(1)(A)–(B), (d)(4)(A); Ohio Admin. Code § 3301–51–07(I)(1), (L)(2)(a). The product of these meetings is the IEP, a document that evaluates the child's academic achievement and functional performance, as well as her short-term and long-term goals. 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(II), (d)(3)(B); Ohio Admin. Code § 3301–51–07(H)(1)(b)–(c). The IEP also specifies the services that the school will provide to help the child to accomplish her goals and sets forth the criteria that the IEP Team will use to evaluate the child's progress over the course of the coming year. 20 U.S.C. § 1414(d)(1)(A)(i)(III)–(IV); Ohio Admin. Code § 3301–51-07(H)(1)(c)–(d).

When parents feel that a school district has failed to comply with its obligations under the IDEA, they may file an action in federal court. 20 U.S.C. § 1415(i)(2); Ohio Admin. Code § 3301–51–05(K)(17)(a). However, "because federal courts are 'generalists with no expertise in the educational needs' of students who have disabilities, the IDEA requires participating states to provide

an impartial 'due process hearing' to any parent who believes his child has not received a FAPE, and makes the exhaustion of that remedy a prerequisite for review in federal court." *Gibson*, 755 Fed. Appx. at 427. *See also Burilovich v. Bd. of Educ. of Lincoln Consol. Schools,* 208 F.3d 560, 566 (6th Cir. 2000).

Ohio has created a two-stage procedure for resolving IDEA disputes. If an aggrieved party files a complaint, the Ohio Department of Education appoints an "impartial hearing officer" ("IHO"), a neutral arbiter with both legal training and familiarity with the IDEA and attendant state and federal regulations, to adjudicate the dispute. *See Gibson*, 755 Fed. Appx. at 427; Ohio Admin. Code § 3301–51–05(K)(10)(c)(i). After receiving evidence and compiling a record, the IHO renders a decision as to whether the school district has denied the pupil a FAPE. Ohio Admin. Code § 3301–51–05(K)(10) – (13). Any party who is dissatisfied with the IHO's decision may file an appeal with the Ohio Department of Education, which then appoints another neutral arbiter called a "state level review officer" ("SLRO") to review the record and issue an independent decision on the merits. Ohio Admin. Code § 3301–51–05(K)(14)(b). A party may then challenge the SLRO's decision in federal district court. Ohio Admin. Code § 3301–51–05(K)(17)(a).

## IV.    Standard of Review

When an IDEA action is filed in federal court, a district court: "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). In so doing, the district court "should make an independent decision based on the preponderance of the evidence but also should give 'due weight' to the determinations made during the state administrative process." *Deal v. Hamilton Cnty. Bd. of*

*Educ.*, 392 F.3d 840, 849 (6th Cir.2004). *See also L.H. v. Hamilton County Dep't of Educ.*, 900 F.3d 779, 790 (6th Cir. 2018); *Somberg v. Utica Community Schools*, 908 F.3d 162, 172 (6th Cir. 2018).

In applying this "modified *de novo*" standard of review, district courts may not "simply adopt the state administrative findings without an independent re-examination of the evidence," nor may they "substitute their own notions of sound educational policy for those of the school authorities which they review." *Deal,* 392 F.3d at 849. *See also L.H.,* 900 F.3d at 790; *Woods v. Northpoint Public School*, 487 Fed. Appx. 968, 973 (6th Cir. 2012). The amount of "due weight" afforded to the administrative findings varies depending on whether such findings are based on educational expertise. *See M.G*, 720 Fed. Appx. at 284; *McLaughlin v. Holt Pub. Schs. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir.2003). "Less weight is due to an agency's determinations on matters for which educational expertise is not relevant.... More weight is due to an agency's determinations on matters for which educational expertise is relevant." *McLaughlin*, 320 F.3d at 669. In sum, a district court "may set aside administrative findings in an IDEA case only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Bd. of Educ. of Fayette Cnty., Ky. v. L.M*., 478 F.3d 307, 312–13 (6th Cir.2007) (internal quotation marks and citation omitted). *See also Woods*, 487 Fed. Appx. at 973.

A district court reviews for both procedural and substantive violations. The Sixth Circuit recently explained this two-step review, as follows:

> The court must first determine whether the school complied with the IDEA's procedural requirements. [*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v.] Rowley*, 458 U.S. [176] at 206, 102 S.Ct. 3034. This is an inquiry into "the process by which the IEP is produced, rather than [into] the myriad of technical terms that must be included in the written document," *Doe v. Defendant I*, 898 F.2d 1186, 1190 (6th Cir. 1990), or into mere technical violations, which do not provide a basis for

invalidating an IEP, *Dong v. Bd. of Educ. of Rochester Cmty. Sch.*, 197 F.3d 793, 800 (6th Cir. 1999). *** If the procedural requirements are satisfied, the court grants greater deference to the State ALJ's determinations on the second step, the substantive analysis. *Dong*, 197 F.3d at 800. In the second step, the court must decide whether the IEP's substantive educational plan was "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. [v. Douglas Cty. School Dist.]* 580 U.S. ------, 137 S.Ct., 988 999 (2017) (*endorsing and narrowing Rowley*, 458 U.S. at 206-07); *accord Deal*, 392 F.3d at 862.

*L.H.*, 900 F.3d at 790-791.

When reviewing the findings of both an IHO and a SLRO, the Court must defer to the SLRO's decision. *See Burilovich,* 208 F.3d at 567 (citing *Renner v. Bd. of Educ. of Pub. Sch. of City of Ann Arbor*, 185 F.3d 635, 641 (6th Cir. 1999)). However, "while the court must give the SLRO deference in matters requiring educational expertise, the Court will not 'second guess' credibility determinations made by the IHO, who was best situated to assess the credibility of testifying witnesses." *Maple Heights City School Bd. of Educ. v. A.C.,* 2016 WL 3475020 at * 5 (N.D. Ohio June 27, 2016). *See also B.H. v. W. Clermont Bd. of Educ.*, 788 F.Supp.2d 682, 693, (S.D. Ohio 2011) (citing *Bd. of Educ. of the City Sch. Dist. of the City of Cincinnati v. Wilhelmy*, 689 F.Supp.2d 970, 987 (S.D. Ohio 2010)).

Plaintiffs argue that, as a matter of law, "the issues before this Court deserve a *de novo* review," rather than a modified *de novo* review. (Doc. No. 51 at p. 2.) The Court disagrees. The Sixth Circuit has repeatedly held that the "modified *de novo*" review standard discussed above is applicable in IDEA cases.[24] *See, e.g., L.H.*, 900 F.3d at 790; *M.G.*, 720 Fed. Appx. at 283; *Somberg*,

---

[24] Plaintiffs cite an unreported, Sixth Circuit table decision from 1997 for the proposition that "[t]he issue of what procedural protections are afforded a disabled child under the IDEA is an issue of law and will receive a *de novo* review." *Morgan v. Chris L. by Mike L.*, 106 F.3d 401 (Table), 1997 WL 22714 (6th Cir. Jan. 21, 1997). This statement, however, relates to the Sixth Circuit's standard of review with respect to a district court's conclusions regarding what procedural protections are afforded a disabled child under the IDEA, rather than a district court's standard of review with respect to an administrative officer's conclusions relating to this issue. Plaintiffs also cite *Knable ex rel. Knable v. Bexley City*

908 F.3d at 172; *Deal*, 392 F.3d at 849. It is true that, under this standard, greater weight is accorded when educational expertise is relevant to an administrative officer's finding. *See e.g., Somberg*, 908 F.3d at 172. This does not, however, mean that *de novo* review necessarily applies with respect to Plaintiffs' alleged procedural violations, which Plaintiffs claim require little to no educational expertise to resolve. Rather, the Court adheres to the modified *de novo* standard of review discussed at length above, meaning that it will "make an independent decision based on the preponderance of the evidence while also giving 'due weight' to the determinations made by the State ALJ." *L.H.*, 900 F.3d at 790.

Plaintiffs next argue that, even assuming a modified *de novo* standard of review applies, this Court should accord "very little deference" to the decisions of the IHO and SLRO because "IDEA administrative hearing officers are not required to possess any educational expertise whatsoever." (Doc. No. 51 at p. 3.) The Court disagrees. Ohio Admin Code § 3301-51-05(K)(10)(c)(i) expressly provides that "at a minimum, a hearing officer: . . . (b) Must possess knowledge of, and the ability to understand, the provisions of the IDEA, federal and state regulations pertaining to the IDEA, and legal interpretations of the IDEA by federal and state courts." Moreover, the Sixth Circuit has stated that administrative judges, such as IHOs and SLROs, are "representative[s] of the state presumed to have both the educational expertise and the ability to resolve questions of educational methodology that the federal courts do not have." *Deal*, 392 F.3d at 865. Thus, this argument in support of Plaintiffs' Motion is without merit and rejected.

---

*School District*, 238 F.3d 755, 766 (6th Cir. 2001) for the proposition that IDEA issues that involve mixed questions of law and fact receive a *de novo* review. This statement in *Knable* likewise relates to the Sixth Circuit's review of the district court's conclusions regarding questions of mixed law and fact, and not to the district court's standard of review with respect to administrative findings and conclusions.

Plaintiffs next claim that this Court should accord no deference to the administrative decisions below because "the administrative hearing officers failed to meet the minimum requirements to be hearing officers in numerous respects." (Doc. No. 51 at p.5.) Specifically, Plaintiffs argue that (1) the IHO and SLRO in the instant case "did not possess knowledge of, and the ability to understand, the provisions of the IDEA, federal and state regulations pertaining to the IDEA, and legal interpretations of the IDEA by federal and state courts;" (2) the IHO "employed a quasi-rules of evidence and procedure standard at the administrative hearing which is intended to be informal without such rules;" and (3) "the SLRO failed to cite a single law (and only cited a single O.A.C. provision), case, or fact as it relates to Parents arguments and simply did not address all of the arguments they raised on appeal." (*Id*. at p. 9.) The Court will address each of these arguments, below.

Plaintiffs first argue that no deference should be accorded to the decisions of either the IHO or the SLRO because "the IHO in this matter discusses FAPE while using an incorrect standard of law for FAPE." (*Id.* at p. 5.) Specifically, Plaintiffs maintain that the IHO in the instant case improperly relied on the wrong standard when, citing *Board of Educ. of Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 201 (1982), she stated that the "IDEA requires a basic floor of opportunity consisting of access to specialized instruction and related services that are individually designed to provide educational benefit to the disabled child."[25] (*Id.*) (citing A.R. 990). Plaintiffs

---

[25] In *Rowley,* the Supreme Court considered the meaning of the phrase "free and appropriate public education," or FAPE. In that case, Amy, a first grader with impaired hearing, had an IEP that did not include having a sign-language interpreter in all of her classes. The district court and Second Circuit Court of Appeals determined that, even though Amy was making excellent progress in school, she had been denied a FAPE because the lack of an interpreter failed to provide her "an opportunity to achieve her full potential commensurate with the opportunity provided to other children." *Rowley*, 458 U.S. at 185-186. The Supreme Court reversed, holding that "the 'basic floor of opportunity' provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201. In this regard, the Court noted that, "if the child is being educated in the regular

assert that the "basic floor of opportunity" standard was abrogated by the 1997 amendments to the

IDEA. (*Id.* at p. 6.) Because the IHO failed to recite the proper legal standard, and the SLRO

subsequently affirmed the IHO's decision, Plaintiffs argue that neither decision should be accorded

any deference. (*Id.* at pp. 6-7.)

The Sixth Circuit has explained that, where a state has a two-tiered review process (as does

Ohio) federal courts are required to defer to the final decision of the state authorities, i.e., the decision

of the SLRO. *See Burilovich,* 208 F.3d at 567; *Maple Heights*, 2016 WL 3275020 at * 5.[26] Thus,

here, the Court is required to review and accord "due weight" to the SLRO's May 2017 decision.

Pursuant to Ohio Admin. Code § 3301-51-05(K)(14)(b)(ii) and (iii), the SLRO in the instant case

conducted a *de novo* review of the IHO's decision. (A.R. 1392.) Notably, the SLRO did not recite

or rely upon the "basic floor of opportunity" standard referenced by the IHO. (A.R. 1388-1394.)

Thus, even if the standard recited by the IHO was incorrect, any error is harmless as this Court applies

deference to the legal conclusions of the SLRO.

Plaintiffs next assert that this Court should accord no deference to the IHO or SLRO decisions

because "the IHO refused to consider all of the evidence Parents sought to present and instead

---

classrooms of the public education system, [the IEP] should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* at 204. In *Deal* (which was decided over twenty years later), the Sixth Circuit concluded that "the IDEA requires an IEP to confer a '*meaningful* educational benefit' gauged in relation to the potential of the child at issue." *Deal*, 392 F.3d at 862 (emphasis in original). Subsequently, in 2017, the Supreme Court again addressed the issue of FAPE in the context of an IEP in *Endrew F. v. Douglas County School District*, 137 S.Ct. 988 (2017). In that case, the Supreme Court expressed some concern that *Rowley* was being interpreted to provide too little protection to disabled children. The Court refined the meaning of the term "FAPE" in *Endrew F.*, stating that "to meet its substantive obligations under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S.Ct. at 999. The Sixth Circuit has since stated that the standard announced in *Endrew F.* is not materially different from the "meaningful educational benefit" standard articulated in *Deal*. *L.H.*, 900 F.3d at fn 5.

[26] *See also Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir. 1990), *superseded by regulations on other grounds as stated in N.W. ex rel. J. W. v. Boone County Bd. of Educ.,* 763 F.3d 611 (6th Cir. 2014).

employed a quasi-rules of evidence/procedure standard, which is not to be done in the informal IDEA administrative hearings." (Doc. No. 51 at p. 12.) This argument is rejected. Plaintiffs do not identify any specific exhibits or evidence that they believe were improperly excluded, instead citing only to the one page of the due process hearing transcript when Plaintiffs moved to admit all of their exhibits. (*Id.* at p. 12) (citing A.R. 2987 (Tr. 3946-3949)). The Court notes that the IHO considered the admissibility of the exhibits individually, resulting in a discussion on the record that spans over 50 pages of the transcript and addressed dozens of exhibits (some of which were admitted in full, some of which were admitted in part, and some of which were not admitted at all.) (A.R. 2987-3001 (Tr. 3946-4005)). Plaintiffs do not identify any specific exhibits that they feel should have been admitted, or otherwise offer any meaningful argument as to why they believe any particular exhibits were improperly excluded. Nor do they articulate how they were allegedly harmed by the IHO's alleged failure to admit any specific exhibits. Under these circumstances, the Court finds that Plaintiffs have failed to adequately raise this issue and, therefore, declines to address it.

Lastly, Plaintiffs assert that this Court should not accord deference to the SLRO's decision because the SLRO "failed to cite to a single fact or case or anything other than a single O.A.C. section that was not relevant, was not a decision that was independent from the IHO's, obviously did not examine the entire hearing record, and definitely did not address the issues raised by the Parents." (Doc. No. 51 at p. 13-14.) Again, the Court disagrees. While the SLRO decision was relatively brief (i.e., 7 pages long), the SLRO cited numerous facts in his discussion of the legal issues presented and clearly explained his reasoning and analysis. (A.R. 1388-1394.) Based on its review of the SLRO decision, the Court does not agree that the SLRO failed to examine the entire hearing record and/or render an independent decision.

The Court notes that the SLRO found that "parents' counsel raises a number of arguments in his appeal that I frankly find irrelevant to the issues at hand." (A.R. 1392.)  To the extent the SLRO failed to address any specific issues that were properly raised by Plaintiffs (both before the SLRO and herein), the Court will, by necessity, employ a *de novo* review of such issues.

## V.     Analysis

### A.      Count III-- Child Find and other Alleged Procedural Violations

In this Motion, Plaintiffs argue that the CFCSD Defendants committed fourteen (14) separate procedural violations of the IDEA.  (Doc. No. 49 at pp. 23-41.)  The Sixth Circuit has held that a district court should "'strictly review an IEP for procedural compliance,' although technical deviations will not render an IEP invalid."  *Deal*, 392 F.3d at 854 (quoting *Dong ex rel Dong v. Bd. of Educ. of the Rochester Cmty. Sch.*, 197 F.3d 793, 800 (6th Cir. 1993)).  *See also Maple Heights*, 2016 WL 3475020 at * 5.  "A finding of procedural violations does not necessarily entitle [a plaintiff] to relief."  *Deal,* 392 F.3d at 854.  *See also Knable*, 238 F.3d at 764.  Rather, for a court to grant relief for a procedural violation, a plaintiff must show that the violation resulted in substantive harm to the student or her parents, "such as seriously infringing on the parents' opportunity to participate in the IEP process, depriving an eligible student of an IEP, or causing the loss of educational opportunity."  *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 520 (6th Cir. 2003).  *See also M.G.*, 720 Fed. Appx. at 285.  The Court will address each of the alleged procedural violations separately, below.

#### 1.      Child Find (Alleged Procedural Violation No. 1)

Plaintiffs first argue that the CFCSD's failure to timely seek an evaluation of A.D. constituted a procedural violation of the IDEA child-find requirement that resulted in substantive harm to A.D. (Doc. No. 49 at pp. 23- 27.)  Specifically, Plaintiffs maintain that CFCSD knew, or should have

36

suspected, that A.D. had a disability when Plaintiffs advised the School District of A.D.'s "special needs" and provided it with a copy of Dr. Baker's May 2015 evaluation diagnosing A.D. with autism, depression, and anxiety. (*Id.*) Plaintiffs also note that Dr. Baker's report itself should have been considered a request for IDEA services, in light of Dr. Baker's discussion of the "extreme negative effects" that bullying had had on A.D., as well as A.D.'s attention problems and "significant" anxiety. (*Id.*) Finally, Plaintiffs maintain that CFCSD's knowledge, in October 2015, that A.D. had been admitted to a partial hospitalization program for her mental health problems, was sufficient to create a suspicion that A.D. had a disability. (*Id.*)

The CFCSD Defendants argue that they did not violate the child find requirements of the IDEA by failing to evaluate A.D. prior to October 12, 2015 because "there were no clear signs that A.D. may have had a disability and Copley-Fairlawn had a rational justification for not evaluating A.D." (Doc. No. 55-1 at pp. 6-16.) In support of this argument, CFCSD Defendants argue that A.D.'s academic performance was exemplary throughout her attendance at the Copley-Fairlawn Schools. (*Id.*) They further note that none of A.D.'s middle school teachers expressed any concerns regarding her class performance or identified any ongoing behavioral issues. (*Id.*)

As noted above, to fulfill their child-find obligation, states must ensure that their schools take appropriate steps to identify and evaluate "[c]hildren who are suspected of being a child with a disability ... and in need of special education, even though they are advancing from grade to grade." 34 C.F.R. § 300.111(c)(1) (emphasis added).[27] *See also L.M.*, 478 F.3d at 313 ("Even children who

---

[27] Ohio's child find provisions are set forth at Ohio Admin. Code § 3301-51-03(A),which provides that: "Each school district shall adopt and implement written policies and procedures approved by the Ohio department of education, office for exceptional children, that ensure all children with disabilities residing within the district, including … children with disabilities attending nonpublic schools, regardless of the severity of their disability, and who are in need of special education and related services are identified, located, and evaluated as required by the Individuals with Disabilities

are only suspected of having a disability, although they are progressing from grade to grade, are protected by this requirement."). To establish a violation of the child-find requirement, a plaintiff "must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate." *L.M.*, 478 F.3d at 313 (quoting *Clay T.*, 952 F. Supp. at 823).

In Ohio, the term "child with a disability" is defined as follows:

> 'Child with a disability' means a child evaluated in accordance with rule 3301-51-06 of the Administrative Code as having an intellectual disability (mental retardation), a hearing impairment (including deafness), a speech or language impairment, a visual impairment (including blindness), a serious emotional disturbance (referred to in this rule as "emotional disturbance"), an orthopedic impairment, autism, traumatic brain injury, any other health impairment, a specific learning disability, deaf-blindness, a developmental delay (for a child between the ages of three and five), or multiple disabilities, **and who, by reason thereof, needs special education and related services**.

Ohio Admin. Code § 3301-51-01(B)(10) (emphasis added). *See also* 20 U.S.C. § 1401(3)(A)(i) and (ii).

Of the impairments listed above, the ones that potentially apply to A.D. are autism, serious emotional disturbance, and "other health impairment." For purposes of the IDEA, the term "autism" is defined, in part, as "a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age three**, that adversely affects a child's educational performance.**" Ohio Admin. Code § 3301-51-01(B)(10)(d)(i) (emphasis added). *See also* 34 C.F.R. 300.8(c)(1)(i). The term "emotional disturbance" is defined as follows:

---

Education Act…" Section § 3301-51-03(B)(3) states that "[c]hild find must also include . . . children who are suspected of being a child with a disability under the definition of child with a disability in paragraph (B)(10) of rule 3301-51-01 of the Administrative Code and in need of special education, even though they are advancing from grade to grade."

"Emotional disturbance" means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree **that adversely affects a child's educational performance:**

(a) An inability to learn that cannot be explained by intellectual, sensory, or health factors.

(b) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

(c) Inappropriate types of behavior or feelings under normal circumstances.

(d) A general pervasive mood of unhappiness or depression.

(e) A tendency to develop physical symptoms or fears associated with personal or school problems.

(f) Emotional disturbance includes schizophrenia. The term does not apply to children who are socially maladjusted, unless it is determined that they have an emotional disturbance under paragraph (B)(10)(d)(v) of this rule.

Ohio Admin. Code § 3301-51-01(B)(10)(d)(v) (emphasis added). *See also* 34 C.F.R. 300.3(c)(4)(i).

Finally, the term "other health impairment" is defined as:

"Other health impairment" means having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that:

(a) Is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and tourette syndrome; and

(b) **Adversely affects a child's educational performance**.

Ohio Admin. Code § 3301-51-01(B)(10)(d)(ix) (emphasis added).

Here, the SLRO found that the CFCSD Defendants did not violate their child find obligations under the IDEA, explaining as follows:

With respect to Child Find and denying FAPE, did School District have reason to believe that Student was a child with a disability? Petitioners point to Student's

39

educational difficulties and bullying incidents as evidence that an evaluation should have been done. However, Student was performing satisfactory academically. There was no evidence that any bullying incidents were affecting academic performance. *** The teachers who testified all testified that Student was progressing academically and behaving appropriately. As the IHO noted, Student was taking a difficult work load, which included honors courses, and was passing her courses and even excelling in some of them. Other than those previously mentioned [i.e., allowing A.D. to walk around the classroom and be seated away from certain students,] Parents did not express any concerns to School District about Student. I agree with the IHO that School District did not have reason to suspect that Student had a disability or was in need of special services.

Based upon Student's steady academic progress and Parents' relative lack of concerns other than allowing walking around and seating assignments, when the parties met in the summer of 2015, based upon a lack of evidence that any bullying incidents affected Student's academic performance, I believe that School District did not violate Child Find or have reason to believe Student was a child with a disability. Therefore, Student did not have an IEP. For these reasons, I do not believe that Student was deprived educational opportunities at school. Finally, since School District did not have reason to believe the child was a student with a disability and because Parents revoked consent to have Student evaluated, I do not believe that Student was denied FAPE.

(A.R. 1393-1394.)

After a careful and independent review of the administrative record, the Court finds that the SLRO's decision is supported by a preponderance of the evidence. As the CFCSD Defendants correctly note, the definitions of autism, emotional disturbance, and "other health impairment" each expressly require that, in order to qualify for IDEA services, the disability must have an adverse impact on the child's educational performance. In addition, the definition of a "child with disability" requires, not only that the child have one of the enumerated disabilities, but also that "by reason thereof, [the child] needs special education and related services." Ohio Admin. Code § 3301-51-01(B)(10) (emphasis added).

Here, however, the record supports the SLRO's conclusion that A.D. was performing well academically and that no behavioral or social concerns were noted that affected her academic

performance.  As discussed at length *supra*, A.D.'s grades were consistently high.   The record reflects A.D. received all A's in fourth grade, and A's and B's in fifth, sixth, seventh and eighth grades.  (A.R. 3133-3137.)  She was moved to an advanced reading group in fifth grade and was placed in an accelerated math class in the seventh and eighth grades.  (A.R. 3133-3134; A.R. 2293 (Tr. 2307)). Ms. Sako testified A.D. was a "high achiever" in the fifth and sixth grades, and stated she had no reason to suspect that A.D. might be a child in need of special education.  (A.R. 2283 (Tr. 2265-2267)).  Likewise, A.D's eighth grade teachers universally testified that they had no concerns regarding A.D.'s academic performance.  Mr. Virgei testified A.D. was a strong English student and had no difficulty relating to others or maintaining eye contact.  (A.R. 2355, 2358, 2362 (Tr. 2404-2405, 2414, 2430-2432)).  Ms. Simenc testified A.D. was a good student who worked well in groups and showed excellent class participation.  (A.R. 2426-2427 (Tr. 2554-2558)).  Even Mr. Green (who thought A.D. might be on the "very low end" of the autism spectrum), did not think she needed any specially designed instruction and had "no concerns" regarding her academic performance.  (A.R. 2338-2339 (Tr. 2336-2337, 2341)).

Plaintiffs argue that "receiving good grades does not prohibit receiving an IEP."  (Doc. No. 51 at p. 8.)  They assert that "smart disabled children may need special education due to impairments that adversely affect their education in areas other than academics alone," such as in the areas of behavioral, social, and emotional well-being.  (*Id*. at p. 9-10.)  The Court does not disagree.  However, in the instant case, Plaintiffs have not directed this Court's attention to evidence that would suggest that the CFCSD Defendants should have been aware (prior to October 2015) that A.D. needed special

education services due to behavioral, social, or emotional issues.[28]  A.D.'s teachers and counselors testified that (prior to the October 12, 2015 shooting note incident), A.D. did not display any behavioral problems and, in fact, presented as a "typical" or "normal" girl.  (A.R. 2283, 2287, 2234 (Tr. 2265-2267, 2071, 2282-2284)).  They also testified that A.D. had friends in class, participated well in groups, and showed no evidence of depression or anxiety.[29]  (A.R.  2287, 2358, 2362, 2369, 2426, 2234-2235, 2263-2265, 2253, 2261 (Tr. 2282, 2284, 2414, 2426-2427, 2430-2432, 2458, 2553-2555, 2071-2074, 2190-2191, 2148, 2178-2179)).  In addition, the record reflects that A.D. participated in some extracurricular activities, such as the National Junior Honor Society and the band Color Guard.[30]  (A.R. 3673).

In sum, the Court finds that the preponderance of the evidence supports the conclusion that, prior to October 2015, the CFCSD Defendants did not overlook clear signs of disability and were not

---

[28] The absence of evidence of such behavioral, social, or emotional problems on the part of A.D. (prior to October 2015) distinguishes the instant case from the cases cited by Plaintiffs.  *See, e.g., Seattle School Dist., No. 1 v. B.S.,* 82 F.3d 1493, 1497 (9th Cir. 1996) (noting that child exhibited "frequent behavioral problems at school, including physical and verbal aggression, oppositionality, tantrums," lying, and stealing, and that this behavior "seriously affected her ability to benefit from classroom instruction"); *Mr. I ex rel. L.I. v. Maine School Admin. Dist. No. 55,* 480 F.3d 1, 6 (1st Cir. 2007) (noting that child's grades declined and that she was regularly missing school, refusing to complete assignments, and showing a "passive resistance to meeting learning goals"); *M.M. v. New York City Dept. of Educ.,* 26 F.Supp.3d 249, 256-257 (S.D. N.Y.) (noting that, due to her mental health conditions, child "was absent from school for weeks at a time"); *G.D. ex rel. G.D. v. Wissahickon School Dist.,* 832 F.Supp.2d 455, 458-459 (E.D. Pa. 2011) (noting that, although he was making academic progress and had a high IQ, child's behaviors were "interfering with his learning"); *Williamson County Bd. of Educ. v. C.K.,* 2009 WL 499386 at * 5-6, 10-11 (M.D. Tenn. Feb. 27, 2009) (noting that child's ADHD affected his educational performance, as evidenced by his lack of organization, failure to complete assignments, and declining grades).

[29] As noted *supra,* the IHO found A.D.'s teachers to be credible, a finding to which we owe deference. *See Maple Heights,* 2016 WL 3475020 at * 2 (stating that "the Court will not 'second guess' credibility determinations made by the IHO, who was best situated to assess the credibility of testifying witnesses.")

[30] The Court rejects Plaintiffs' argument that Dr. Baker's May 23, 2015 report should have put the CFCSD Defendants on notice that A.D. needed special education services.  While Dr. Baker diagnoses A.D. with autism, depression, and anxiety, she does not indicate how she believes A.D.'s conditions would adversely impact her educational performance. (A.R. 3781.)  Indeed, Dr. Baker acknowledges that "[a] challenge for [A.D.] may be qualifying for an IEP, as her grades are not impaired."  (*Id.*)  Ms. Morganti testified that Dr. Baker's report and the June 2015 meeting did not cause her to believe that special education services were needed because there "wasn't anything that we felt was significantly impacting her ability, you know, to learn at school."  (A.R. 2770 (Tr. 3458)).

negligent in failing to order testing. *See L.M.* 478 F.3d at 313. Nor have Plaintiffs demonstrated that there was no rational justification for not deciding to evaluate A.D. prior to October 2015. *Id.* Thus, the Court concludes that the CFCSD Defendants did not violate the child find provisions of the IDEA by failing to evaluate A.D. prior to October 2015.

Plaintiffs also assert that they have suffered substantive harm because the CFCSD Defendants should have immediately started the evaluation process once A.D. was expelled and/or when they learned that A.D. was participating in a partial hospitalization program ("PHP"). (Doc. No. 49 at pp. 26-27.) The Court finds this argument to be without merit. As noted above, the events surrounding A.D's expulsion occurred within a very compressed time frame: (1) A.D. was suspended on October 13, 2015; (2) she was placed in the PHP from October 15-30, 2015; (3) A.D. was expelled on October 28, 2015; (4) the Dougalls withdrew A.D. from CFCSD on November 5, 2015; (5) an expulsion appeal hearing was conducted on November 17, 2015; and (6) A.D.'s expulsion was upheld on November 19, 2015. Shortly thereafter, on December 7, 2015, the CFCSD Defendants emailed the Dougalls an invitation to an ETR planning meeting, to begin the process of evaluating A.D. for an IEP.

Even assuming *arguendo* that the relatively short delay between A.D's admittance to the PHP on October 15, 2015 and the December 7, 2015 ETR planning meeting invitation constitutes a technical procedural violation of the IDEA, the Court finds Plaintiffs have not demonstrated that they suffered substantive harm as a result thereof. Accordingly, and for all the reasons set forth above, the Court finds this ground for relief to be without merit.

      **2.**      **Failure to Timely Provide Plaintiffs with the IDEA Procedural Safeguards Notice (Alleged Procedural Violation No. 2)**

43

Plaintiffs next argue that they suffered substantive harm because the CFCSD did not provide them with information regarding IDEA procedural safeguards until November 24, 2015. (Doc. No. 49 at p. 28.) They assert that they should have been provided with this information much sooner and not later than one of the following: (1) in June 2015, when CFCSD learned that A.D. had been diagnosed with autism, depression, and anxiety, and was experiencing significant bullying, (2) in October 2015, when A.D. was expelled; or (3) in October 2015, when CFCSD learned that A.D. had been admitted to a PHP due to her mental health conditions. (*Id.*) The CFCSD Defendants do not address this argument.

Ohio Admin. Code § 3301-51-05(I) provides that: "A copy of the procedural safeguards available to the parents of a child with a disability must be given to the parents only one time a school year, except that a copy also must be given to the parents: (a) Upon initial referral or parent request for evaluation; (b) Upon receipt of the first due process complaint under paragraph (K)(7) of this rule in a school year; (c) In accordance with the discipline procedures in paragraph (K)(20) of this rule; and (d) Upon request by a parent."

For the following reasons, the Court finds the CFCSD Defendants did not violate Plaintiffs' procedural rights under the IDEA when they failed to provide an IDEA procedural safeguards notice before November 24, 2015. As discussed at length above, prior to October 15, 2015, CFCSD did not know or have reason to suspect that A.D. was a "child with a disability" for purposes of the IDEA. Thus, the Court finds it was not a procedural violation for CFCSD to fail to provide Plaintiffs with the procedural safeguards notice prior to October 15, 2015. Moreover, even assuming *arguendo* that the failure to provide an IDEA procedural safeguards notice between October 15, 2015 and November

24, 2015 constituted a procedural violation, the Court finds that Plaintiffs have failed to meaningfully argue or demonstrate that they were substantively harmed as a result.

Accordingly, the Court finds this ground for relief to be without merit.

### 3. Failure to Provide Timely Prior Written Notice of, or Ensure Proper Parental Participation at, the December 14, 2015 ETR Planning Meeting (Alleged Procedural Violations Nos. 3 and 4)

Plaintiffs next argue that "CFCSD failed to ensure appropriate parental participation for the evaluation planning meeting when it failed to provide the Parents an IDEA prior written notice for the evaluation planning meeting or schedule the meeting in advance, and by failing to allow A.D.'s mother to participate in the planning meeting." (Doc. No. 49 at p. 29.) The CFCSD Defendants do not address this argument.

A school must provide a student's parents with prior written notice within a reasonable time before it proposes to initiate or change (or refuses to initiate or change) the identification, evaluation, educational placement, or provision of a FAPE to a child with a disability. *See M.G.*, 720 Fed. Appx. at 285; 20 U.S.C. § 1415(b)(3); 34 C.F.R. § 300.503(a). [31] The notice should be issued early enough to ensure that parents will have an opportunity to attend and should schedule the meeting at a mutually agreeable time and place. *See* 34 CFR § 300.322(a). Both the Supreme Court and the Sixth Circuit have emphasized that the IDEA requires that parents be provided the opportunity to meaningfully participate in the IEP process. *See Rowley*, 458 U.S. at 205-206 ("It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents

---

[31] Ohio Admin. Code § 3301-51-05(H)(1) provides that: "Written notice that meets the requirements of paragraph (H)(2) of this rule must be given to the parents of a child with a disability a reasonable time before the school district of residence: (a) Proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child; or (b) Refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child."

and guardians a large measure of participation at every stage of the administrative process, . . . as it did upon measurement of the resulting IEP against a substantive standard."); *Deal*, 392 F.3d at 857 ("[T]o fulfill the goal of parental participation in the IEP process, the school district was required to conduct, not just an IEP meeting, but a *meaningful* IEP meeting.") As noted above, substantive harm may occur when the procedural violations in question "seriously infringe[s] upon the parents' opportunity to participate in the IEP process." *Knable*, 238 F.3d at 765-766. *See also Nack ex rel. Nack v. Orange City School Dist.,* 454 F.3d 604, 612 (6th Cir. 2006).

Plaintiffs argue that the CFCSD Defendants "sprung the evaluation planning meeting on A.D.'s Father without any notice when he was at the school for a different matter, without A.D. or A.D.'s Mother, and without any explanation of the family's IDEA rights." (Doc. No. 49 at p. 29.) The Court disagrees with Plaintiffs' characterization of the evidence. The record reflects that, on December 7, 2015, CFCSD emailed the Dougalls an invitation to an ETR Planning Meeting scheduled to occur two days later, on December 9, 2015. (A.R. 3558.) The invitation advised the Dougalls to contact Ms. Kowalski if they preferred to schedule the meeting at a different time. (*Id.*) The Dougalls did not respond to the invitation, and a second invitation was emailed to them on December 8, 2015. (A.R. 3559.) Again, the Dougalls did not respond. Dr. Doyle testified that she then attempted to reach the Dougalls by calling and leaving a voicemail; however, she received no response. (A.R. 2749 (Tr. 3374-3375)). Plaintiffs do not assert that they did not receive the above emails or voice mail messages. The meeting scheduled for December 9, 2015 did not occur. (A.R. 1934 (Tr. 1372)).

Several days later, on December 14, 2015, the parties were engaged in an attempt to mediate Plaintiffs' due process complaint. (A.R. 2749 (Tr. 3374-3375)). Since the parties were gathered

together for the mediation, Dr. Doyle suggested to Mr. Dougall and his two attorneys that they conduct the ETR Planning Meeting at that time. (*Id.*) Mr. Dougall (with the advice of his lawyers, who were both present) agreed to go forward the ETR Planning Meeting, despite the fact that Mrs. Dougall was not present. (*Id.*) *See also* A.R. 1749 (Tr. 929). Mr. Dougall and his lawyers participated in the meeting, along with Dr. Doyle and counsel for CFCSD. (A.R. 3115-3116; A.R. 1749 (Tr. 929)).

In light of the above sequence of events, the Court cannot find that the CFCSD Defendants acted improperly or denied Plaintiffs their procedural rights under the IDEA. The CFCSD Defendants first attempted to schedule the meeting on December 7, 2015 and made numerous attempts to contact the Dougalls. CFCSD did not conduct the meeting in the Dougalls' absence. Rather, when the parties were together for a mediation on December 14, 2015, CFCSD simply suggested conducting the meeting on that date as a matter of convenience. Plaintiffs have not offered any explanation as to why they could not have declined Dr. Doyle's suggestion and requested to schedule the meeting for a different time so as to ensure Mrs. Dougall's participation. Indeed, Mr. Dougall was accompanied at this time by his attorneys, who could easily have advocated a different meeting time on his behalf if they felt it was necessary to do so.

In light of the above, the Court rejects Plaintiffs' argument that the CFCSD Defendants committed a procedural violation of the IDEA in connection with the decision to conduct the ETR Planning Meeting on December 14, 2015.

### 4. Failure of IEP Team to Review Existing Information, Data, and Private Evaluations (Alleged Procedural Violations Nos. 5, 6, 7)

Plaintiffs argue that their procedural rights were violated because the CFCSD did not have all the mandatory IEP team members participate in the December 14, 2015 evaluation planning meeting.

(Doc. No. 49 at p. 32.)  They further assert that the "non-compliant evaluation planning team did not review any information or data regarding A.D." and, instead, "rushed to conduct more tests on A.D. without ever telling Parents of what assessments or tests it would be doing."  (*Id*.)  Had CFCSD done so, Plaintiffs argue, it "would have easily seen there was more than enough information available to proceed with an IDEA evaluation without any additional assessments."  (*Id*.)  The CFCSD Defendants do not address this argument.

The Court finds Plaintiffs' argument to be without merit.  Ohio Admin. Code § 3301-51-06(B) sets forth the requirements for conducting an initial evaluation under the IDEA.  Specifically, Section 3301-51-06(B) states that: "[e]ach school district of residence must conduct a full and individual initial evaluation, in accordance with this rule, before the initial provision of special education and related services under Part B of the Individuals with Disabilities Education Act, . . . to a child with a disability residing in the school district."  Ohio Admin. Code § 3301-51-06(B).  The initial evaluation must be conducted within 60 days of receiving parental consent for the evaluation and must consist of procedures "to determine if the child is a child with a disability . . . and to determine the educational needs of the child."  Ohio Admin. Code § 3301-51-06(B)(4).  In conducting the assessment, the school district must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parents."  Ohio Admin. Code § 3301-51-06(E)(2)(a).  Among other things, the school district must review and summarize existing evaluation data regarding the child and identify what additional data, if any, is needed to determine whether the child is a "child with a disability" and the educational needs of the child.  Ohio Admin. Code § 3301-51-06(F).

The December 14, 2015 ETR planning meeting was, therefore, the beginning of the IEP evaluation process for A.D. As Ms. Kowalski testified, the purpose of the meeting was to "identify what areas *will be* assessed or what areas there might be available information *that can then be reviewed* and identifying the titles of the individual who will be completing the assessment or summarizing the information." (A.R. 1935 (Tr. 1374)) (emphasis added). That is precisely what occurred during the December 14, 2015 meeting. The ETR Planning Form identified A.D.'s suspected disabilities, as well as the specific areas in which additional testing was necessary. (A.R. 3115.) Dr. Doyle explained the types of assessments that would be conducted and invited the Dougalls to provide any existing information to CFCSD that might be helpful in evaluating A.D.'s needs. (A.R. 2751-2756 (Tr. 3383-3401)). Plaintiffs complain that CFCSD should have realized, at the time of the December 14, 2015 planning meeting, that existing information was sufficient to assess whether A.D. was a child with a disability and determine the scope and nature of her educational needs. The Court disagrees. It was not reasonable to expect CFCSD to make that determination at the time of the ETR Planning Meeting, as CFCSD did not have in its possession all of the existing data it needed to make that assessment[32] and, further, it had not yet had the opportunity to review, summarize, and interpret the information that it did have in its possession.

Plaintiffs also appear to complain that their procedural rights were violated because the CFCSD Defendants should have, at some undetermined point in time after the ETR Planning

---

[32] Indeed, Dr. Kowalski testified that, after the meeting, an evaluation packet was sent to Plaintiffs that included a host of forms, questionnaires, and releases that needed to be completed as part of the initial evaluation process. (A.R. 1943 (Tr. 1406-1408)). Moreover, the Court rejects Plaintiffs' argument that Dr. Baker's report was sufficient, standing alone, to demonstrate that no other assessments or information was necessary in order to evaluate A.D. for an IEP. *See Hupp v. Switzerland of Ohio Local Sch. Dist.*, 912 F.Supp.2d 572, 596 (S.D. Ohio 2012) ("Nothing in the statute or regulations requires the [IEP] team to adopt the recommendation of a student's private physician or psychologist.").

Meeting, realized that they did not need any additional information in order to assess A.D.  The Court rejects this argument.  As discussed *infra*, it was not unreasonable for the CFCSD Defendants to determine that it needed additional information (including classroom observations of A.D. at her new school) in order to determine whether A.D. was a "child with a disability" and assess her educational needs.  Accordingly, the Court finds this argument to be without merit.

> **5.**   **Failure to Explain the Evaluation Process and Identify the Tests/Assessments it Sought to Conduct (Alleged Procedural Violation No. 8)**

Plaintiffs argue that CFCSD failed to obtain informed consent for its evaluation of A.D. because it did not adequately explain the evaluation process and/or what tests and assessments it sought to conduct.  (Doc. No. 49 at p. 33.)  They assert that "[i]t is clear by refusing to answer Parents' questions, failing to tell the Parents of what types of assessments it was seeking to be done, and when the testing would take place, deprived Parents of the ability to consent to those assessments pursuant to law."  (*Id*. at p. 34.)  Plaintiffs further argue, that "[[r]egardless of the consent issue, CFCSD violated the IDEA by not discussing these details with the IEP team, which the Parents were required to be a part of."  (*Id*.)  Once again, the CFCSD Defendants do not address this argument.

Under the IDEA, "consent means that . . . the parent has been fully informed of all information relevant to the activity for which consent is sought."  34 C.F.R. § 300.9(a).  The Court finds Plaintiffs have not demonstrated either that CFCSD failed to explain the evaluation process, or that Mr. Dougall's consent was not fully informed.  As noted above, Dr. Doyle testified, at some length, that she explained how the evaluation would be conducted and discussed the types of assessments and tests that would be used, the types of information that would be gathered, and the staff who would be conducting the tests and gathering the information.  (A.R. 2751-2756 (Tr. 3383-3401)).  She further

testified that, during this meeting, it was expressly discussed and agreed that testing and observations would occur at Our Lady of the Elms as part of the evaluation. (A.R. 2756 (Tr. 3403)).

The IHO determined that Dr. Doyle was a "careful, exact, credible witness." (A.R. 971.) Moreover, the ETR Planning Form (which was signed by Mr. Dougall) also clearly identifies each of the assessment areas (including "classroom-based evaluations") and states that some of the assessment would be based on information from teachers at Our Lady of the Elms. (A.R. 3115.) In light of the above, the Court rejects Plaintiffs' argument that CFCSD violated their procedural rights by failing to fully explain the evaluation process and/or obtain Mr. Dougall's informed consent.

### 6. Performance of Activities without Consent to do so (Alleged Procedural Violation No. 9)

Plaintiffs argue that CFCSD violated their procedural rights by "conducting activities to which they had not yet consented to being done." (Doc. No. 49 at p. 34-35.) Plaintiffs do not identify any specific activities that it believes CFCSD conducted without consent or otherwise further develop this argument, either legally or factually.

The Court finds that Plaintiffs failed to sufficiently raise this issue in their Motion. Plaintiffs' entire discussion of this alleged procedural violation is one paragraph. Plaintiffs do not identify the specific activities they believe were conducted without consent and do not meaningfully apply the law regarding consent to the facts of the instant case. Under these circumstances, the Court finds that Plaintiffs waived any argument regarding this issue. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir.1997) ("[I]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (quoting *Citizens*

*Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir.1995)).[33]

7.    **Termination of IEP Evaluation (Alleged Procedural Violation No. 10)**

Plaintiffs next assert that CFCSD improperly terminated A.D.'s IEP evaluation based on the erroneous conclusion that the Dougalls' revocation of the release relating to Our Lady of the Elms, constituted a revocation of consent to the IEP evaluation itself. (Doc. No. 49 at pp. 35-37.) They maintain that, as a matter of law, they were "able to reject one proposed 'service or activity' and CFCSD was not legally allowed to 'deny the parent or child any other service, benefit, or activity' as it did by ceasing the entire IDEA evaluation of A.D." (*Id*. at p. 36.) Plaintiffs argue that they "never refused consent for the receipt of special education," maintaining that "instead, they sought to work with CFCSD and to be a part of the process as the law guarantees and simply did not agree with a single portion of CFCSD's proposed evaluation." (*Id*. at p. 37.)

---

[33] Based on facts recited earlier in Plaintiffs' Brief, the Court surmises that this claim is likely based on CFCSD's interactions with Our Lady of the Elms in January 2016. Specifically, the Court notes that Mr. Dougall signed the consent portion of the ETR Planning Meeting form on December 14, 2015. (A.R. 3622.) Four days later, Ms. Kowalski contacted Ms. Wilhite, principal of Our Lady of the Elms, in order to arrange classroom observation and testing. (*Id*.) On January 5, 2016, Mr. Dougall completed a release form relating to Our Lady of the Elms but did *not* check the boxes allowing CFCSD to conduct interviews with Our Lady of the Elms teachers or perform classroom observations. (A.R. 3443.) Nonetheless, on January 7, 2016, CFCSD speech pathologist Christine Reguiero arrived at the Elms to begin A.D.'s testing. (A.R. 3622.) A.D. refused to be tested, indicating that she believed she was not supposed to talk to anyone from CFCSD. (*Id*.) Ms. Wilhite then called Mr. Dougall, who orally gave his consent to conduct the testing with Ms. Reguiero. (*Id*.) *See also* A.R. 1753 (Tr. 942-943). The next day, Ms. Kowalski met with A.D.'s teachers at Our Lady of the Elm to discuss the evaluation process. (A.R. 3622.) On January 13, 2016, Ms. Kowalski attempted to conduct a classroom evaluation of A.D., but A.D. was not present at school that day. (*Id*.) Mr. Dougall thereafter revoked all releases on January 18, 2016. (*Id*.) As noted above, in their briefing before this Court, Plaintiffs do not specifically identify any of the above incidents as forming the basis of this claim. However, even if they had, the Court would find that Plaintiffs had failed to show that they suffered any "substantive harm" as a result; i.e, that CFCSD's actions "seriously infring[ed] on the parents' opportunity to participate in the IEP process, depriv[ed] an eligible student of an IEP, or caus[ed] the loss of an educational opportunity." *Berger*, 348 F.3d at 520. As noted above, when contacted by Ms. Wilhite, Mr. Dougall orally gave his consent to allow Ms. Reguiero to conduct testing on A.D. In addition, while Ms. Kowalski appeared at the school to conduct a classroom observation, that observation did not occur because A.D. was not at school that day. Moreover, Plaintiffs do not identify any substantive harm that allegedly resulted from any communications that may have occurred between Ms. Kowalski and Our Lady of the Elms between January 5th through January 18th, 2016.

The CFCSD Defendants argue that Plaintiffs' actions "clearly and undisputedly constitute a *de facto* revocation of their consent to A.D.'s evaluation." (Doc. No. 55-1 at p. 24.) They assert that Plaintiffs' "refusal to permit any Copley-Fairlawn staff member from having contact with A.D. clearly made it impossible for Copley-Fairlawn to use the variety of assessments required by the IDEA to be generated in evaluating A.D., including standardized assessments, classroom-based assessments and classroom-based observations; made it impossible to include observations by A.D.'s teachers in the evaluation; and made it impossible to include observations of A.D.'s classroom setting in the evaluation." (*Id*. at p. 23.) Defendants argue that Plaintiffs' improperly sought to control the evaluation process, making it "impossible for Copley-Fairlawn to conduct A.D.'s evaluation in the manner required by the IDEA." (*Id*. at p.24.)

The IDEA provides that, in conducting an evaluation, a school district shall "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining . . . whether the child is a child with a disability." 20 U.S.C. § 1414(b)(2)(A). IDEA regulations further provide as follows:

> As part of an initial evaluation (if appropriate) and as part of any reevaluation under this part, the IEP Team and other qualified professionals, as appropriate, must—
>
> (1) Review existing evaluation data on the child, including—
>
> (i) Evaluations and information provided by the parents of the child;
>
> (ii) Current classroom-based, local, or State assessments, and **classroom-based observations**; and
>
> (iii) **Observations by teachers and related services providers**; and
>
> (2) On the basis of that review, and input from the child's parents, identify what additional data, if any, are needed to determine—

(i)(A) Whether the child is a child with a disability, as defined in § 300.8, and the educational needs of the child. . .

34 CFR § 300.305(a)(1) and (2). The regulations further mandate that "[t]he public agency must administer such assessments and other evaluation measures as may be needed to produce the data identified under paragraph (a) of this section." 34 CFR § 300.305(c).

Here, it is undisputed that Plaintiffs revoked consent for CFCSD to conduct any classroom observations of A.D or interact with any of her teachers at Our Lady of the Elms. On January 13, 2016, Plaintiffs (through counsel) informed CFCSD that "we do not want personnel from Copley coming to the Elms . . . nor do we want the District interacting with Elms personnel." (A.R. 3543.) On January 18, 2016, Mr. Dougall formally revoked his consent as follows: "We are revoking all releases executed by us to Copley Fairlawn School District concerning [A.D.]." (A.R. 3547.) Ms. Spencer responded the next day and asked: "are [the Dougalls] revoking consent for the evaluation, or releases for the following: to speak to Elms staff, to obtain records and information from the Elms, and to obtain records and information from the Student's providers; or are they revoking all of it?? Your narrative suggests that we can't observe, or obtain records/information, or test." (A.R. 3546.) Mr. Wallace replied that "as of this moment, we are revoking all releases executed by the Dougalls." (A.R. 3545.) The next day, Mr. Wallace advised Ms. Spencer that "we are revoking all releases for everything." (A.R. 3548.)

By revoking consent to perform these assessments, Plaintiffs prevented CFCSD from being able to conduct A.D.'s evaluation in compliance with IDEA regulations and in the manner in which

it felt it needed in order to understand A.D.'s educational needs.[34]  At the due process hearing, Ms. Kowalski testified that, in order to complete A.D.'s initial evaluation, she needed to obtain information from A.D.'s teachers at Our Lady of the Elms about A.D.'s current performance in the classroom setting, including information about "what are they seeing as far as her academic skills or her social interactions within that classroom."[35]  (A.R. 1936 (Tr. 1380-1381)).  She also stated that she needed to conduct interviews with A.D.'s teachers and school personnel at Our Lady of the Elms because "they have more interactions, more experience with her. So their observations are always another important part of that evaluation process."  (A.R. 1941 (Tr. 1401)).  In particular, Ms. Kowalski indicated that she needed to determine whether Our Lady of the Elms was using any interventions for A.D. that were designed specifically to support her in the classroom.[36]  (A.R. 1937 (Tr. 1382)).  Indeed, Ms. Kowalski stated that, if she was not able to request information from A.D.'s teachers at the Elms, "it would significantly limit our ability to identify her needs within the educational setting."  (A.R. 1942 (Tr. 1402)).

---

[34] As a private parochial school, Our Lady of the Elms does not conduct IEP evaluations.

[35] The Court notes that the ETR Planning Form also includes obtaining information from A.D.'s teachers at CFCSD. (A.R. 3115.)  However, Ms. Kowalski testified that, because A.D. had only been at Copley High School for about six weeks before being expelled, she also needed to obtain information from A.D.'s then-current teachers at Our Lady of the Elms.  (A.R. 1936 (Tr. 1379-1380)).

[36] Notably, it appears counsel for Plaintiffs specifically encouraged CFCSD to obtain this information from Our Lady of the Elms during the evaluation process.  Although much of the audio of the December 14, 2015 meeting is difficult to hear, the Court was able to discern Mr. Wallace asking Dr. Doyle if it would be possible for CFCSD to get information from A.D.'s teachers at the Elms.  *See* Doc. No. 52.  Specifically, Mr. Wallace asked "is there anything we can do about getting some of the information from the people that are her current teachers  . . . because that would be something that we would like to look at that, because there's some teachers that are working extensively with her and she's without any 504/IEP.  She takes tests already in a quiet place, alone from students, so if we could get some of that, that would be awesome."  Dr. Doyle said "Okay. I am going to specify on [the ETR Planning Form] the general education teachers at Copley and the Elms, so that's included," to which Mr. Wallace responded "that would be great."  *See* Disc at 5:32 to 6:02.

Ms, Kowalski further testified that an important part of the initial evaluation process included the ability to perform her own classroom observations, noting that it allows her to evaluate the following: "is the student following directions when the teacher is providing them, does the student appear to be following along with the instruction, are they participating if the teachers are allowing opportunities for participation, or if they're doing any collaborative or group work, how is the student interacting in those situations." (A.R. 1939 (Tr. 1391-1392)). She also explained that she needed to conduct an "individualized measure of academic achievement," which involved "working one on one with the student doing some assessments of reading, writing, and math abilities." (A.R. 1936 (Tr. 1379)). Additionally, in order to determine how A.D.'s autism affects her in the school setting, Ms. Kowalski planned to administer the Behavior Assessment System for Children, Third Edition ("BASC"), which is a rating tool that includes parent, teacher, and self-evaluation forms. (A.R. 1938find (Tr. 1386-1387)). The IHO found Ms. Kowalski to be a credible witness. (A.R. 972.)

Plaintiffs argue that IDEA regulations allow parents to reject one proposed service or activity without forfeiting the right to special education services altogether. They note that IDEA regulations provide that "[a] public agency may not use a parent's refusal to consent to one service or activity under paragraphs (a), (b), (c), or (d)(2) of this section to deny the parent or child any other service, benefit, or activity of the public agency, except as required by this part." 34 C.F.R. § 300.300(d)(3). Here, however, Plaintiffs did not simply refuse to consent to "one service or activity" proposed by CFCSD. Instead, Plaintiffs revoked consent for CFCSD to have any access to A.D. or her teachers at Our Lady of the Elms, instead insisting that the School District already had enough information to complete its evaluation of A.D. The Court agrees with the SLRO and IHO that Plaintiffs' actions

and attempts to exert complete control over the evaluation process prevented CFCSD from properly conducting the evaluation and, thereby, amounted to a revocation of consent to the evaluation itself.[37]

The Court also rejects Plaintiffs' argument that their actions should not be construed as a revocation of consent because they repeatedly asked the School to continue with the evaluation and offered to "help get the evaluation completed without bothering [A.D.] at the Elms." (A.R. 3546.) The fact remains that Plaintiffs refused to allow CFCSD to conduct the interviews, evaluations, and observations that they needed to perform in order to evaluate A.D. consistent with IDEA regulations. Under these circumstances, the Court finds Plaintiffs have failed to demonstrate that the CFCSD violated their procedural rights under the IDEA.

### 8. Alleged Refusal to Initiate a New Evaluation (Alleged Procedural Violations Nos. 11, 12, 13)

Plaintiffs argue that, even if the Court were to determine that consent had been revoked, CFCSD "was still under the affirmative, ongoing obligation of child find, thus, requiring the evaluation to take place once Parents requested IDEA services again." (Doc. No. 49 at p. 37.)   They cite authority for the proposition that "[a]fter revoking consent for special education and services for his or her child, a parent maintains the right to subsequently request an initial evaluation to determine if the child is a child with a disability who needs special education and related services." *Letter to Cox*, 54 IDELR 60 (OSEP 2009).  Plaintiffs assert that, despite their repeated requests that it do so,

---

[37] Plaintiffs' reliance on *A.H. v. Clarksville-Montgomery County School System*, 2019 WL 483311 (M.D. Tenn. Feb. 7, 2019) is misplaced.  In that case, the parents objected to a draft IEP that would have placed their three-year old child with Down's Syndrome in a special education classroom despite the fact that the child's IEP team had determined that, if possible, the child's least restrictive environment would be in a general educational preschool alongside nondisabled peers.  *Id.*  In that case, the district court found the parents had not refused to consent to special education services, noting "they just disagreed with a core aspect of the plan offered."  *Id.* at * 8.  Here, however, Plaintiffs' refusal to allow CFCSD to conduct classroom observations and interact with A.D.'s teachers effectively prevented CFCSD from being able to evaluate whether A.D. was a "child with a disability" in the first instance.  The Court finds this renders the instant case distinguishable from *A.H.*

CFCSD failed to move forward with a new evaluation planning meeting and "start the evaluation process over." (*Id.*) The CFCSD Defendants do not address this argument.

The Court does not disagree that a parent may subsequently request an initial evaluation after revoking consent. Here, while Plaintiffs did request that CFCSD conduct a Multi-Factored Evaluation on February 11, 2016 (A.R. 3540), Plaintiffs made very clear that they continued to "revoke[] all releases that provide the school with unfettered access to [A.D.'s] records, medical care, or providers, and her new school." (*Id.*) In other words, the situation had not changed. Plaintiffs continued to deny CFCSD the ability to conduct the interviews, evaluations, and observations that it needed to perform in order to evaluate A.D. consistent with IDEA regulations. Under these circumstances, the Court cannot find that the CFCSD Defendants violated Plaintiffs' procedural rights under the IDEA.

Plaintiffs next argue that CFCSD "refused to evaluate A.D. because it wanted a different school to evaluate A.D., despite CFCSD being A.D.'s school district of residence." (Doc. No. 49 at p. 38.) They maintain that, as A.D.'s school district of residence, CFCSD was required, as a matter of law, to provide her with a FAPE. (*Id.* at pp. 38-39.) Plaintiffs assert that CFCSD violated their procedural rights because they wrongfully required Plaintiffs to reenroll A.D. in Copley-Fairlawn High School before it would conduct an evaluation.

The Court need not reach the legal issue of which school district (i.e., CFCSD as the school district of residence, or Akron City School District as the school district in which Our Lady of the Elms is located) is required to conduct an initial evaluation of A.D. under the IDEA and Ohio's implementing regulations. The fact remains that Plaintiffs have consistently refused to allow CFCSD to conduct the assessments and gather the information necessary to evaluate A.D. consistent with

IDEA regulations.  Moreover, the Court notes that Dr. Doyle testified that CFCSD would be open to conducting an evaluation of A.D. if consent was provided, stating "we would be happy to do another evaluation, but still we have to have access to the child and to the teachers that are educating the child."  (A.R. 1666 (Tr. 738)).  In light of the above, the Court rejects Plaintiffs' argument that the CFCSD violated their procedural rights.[38]

### 9. Predetermination (Alleged Procedural Violation No. 14)

Finally, Plaintiffs argue that CFCSD violated their procedural rights because "it is clear that CFCSD was not willing to listen to Parents' concerns or work with them as evidenced by CFCSD's conduct throughout this hearing." (Doc. No. 49 at p. 41.) They assert that CFCSD "simply did not want A.D. to ever return to its school system."  (*Id*.)  The CFCSD Defendants do not address this argument.

The Sixth Circuit has held that predetermination amounts "to a procedural violation of the IDEA."  *Deal*, 392 F.3d at 857.  *See also Nack v. Orange City School Dist*., 454 F.3d 604, 610 (6th Cir. 2006).  It can cause substantive harm, and therefore deprive a child of a FAPE, where parents are "effectively deprived" of "meaningful participation in the IEP process."  *Deal*, 392 F.3d at 857.  "However, predetermination is not synonymous with preparation."  *Nack*, 454 F.3d at 610.  Federal law "prohibits a completed IEP from being presented at the IEP Team meeting or being otherwise forced on the parents, but states that school evaluators may prepare reports and come with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the

---

[38] Plaintiffs also argue that CFCSD's refusal to conduct an IDEA evaluation of A.D. prevented her from accessing the Jon Peterson and Autism Scholarships, both of which require an IEP.  (Doc. No. 49 at pp. 40-41.)  This argument is rejected for the reasons discussed above.

parents and parents have the opportunity to make objections and suggestions." *N.L. ex rel. Mrs. C v. Knox County Sch.*, 315 F.3d 688, 694 (6th Cir. 2003).

The crux of Plaintiffs' argument is that, in conducting the initial evaluation, CFCSD failed to listen to (or accommodate) Plaintiffs' concerns about assessments that would disrupt A.D. or cause her to regress in her treatment, because CFCSD had already decided that it did not want A.D. in its school system. The Court rejects this argument. This is not a situation where CFCSD refused to listen to Plaintiffs' concerns.[39] Rather, CFCSD felt it was unable to accommodate Plaintiffs' concerns and, at the same time, be able to conduct the evaluation in accordance with IDEA regulations. Under these circumstances (i.e., where Plaintiffs' demands effectively prevented the CFCSD from its ability to evaluate A.D.), the Court does not find Plaintiffs to have demonstrated predetermination.[40] Accordingly, and for all the reasons set forth above, the Court rejects Plaintiffs' arguments that CFCSD violated their procedural rights under the IDEA.

### B. Count II – Denial of FAPE

Plaintiffs allege that the CFCSD failed to meet its substantive obligations under the IDEA by failing to identify A.D. as a "child with a disability" under the IDEA. (Doc. No. 49 at pp. 42-44.)

---

[39] Plaintiffs do not explain how allowing Ms. Kowalski to gather information from A.D.'s teachers (through interviews between Ms. Kowalski and those teachers, and/or through having A.D.'s teachers complete questionnaires or "rating scales") would have caused A.D. harm. Nor do they argue or articulate in their briefing before this Court how allowing Ms. Kowalski to observe A.D. in her classroom setting would have harmed A.D.

[40] Plaintiffs direct this Court's attention to the testimony of Paula Thompson, who was A.D.'s 9th grade French teacher at CFCSD. Ms. Thompson testified that a CFCSD administrator, Michael Coury, said to her about A.D. that "you wouldn't want someone like that to come back into our school." (A.R. 2376 (Tr. 2488-2489)). This was undoubtedly an unfortunate and inappropriate remark. However, Plaintiffs have not explained what Mr. Coury's role (if any) was in the initial evaluation process. Notably, they have not directed this Court's attention to any evidence that any of the individuals who were directly involved in that evaluation (such as Dr. Doyle, Ms. Kowalski, or any of A.D.'s CFCSD teachers) shared this sentiment.

As noted above, the IDEA requires states that receive federal funds for education to provide every disabled child who wants it a "free and appropriate public education" ("FAPE"). *L.H.*, 900 F.3d at 788. A FAPE, as the Act defines it, includes both "special education" and "related services." 20 U.S.C. § 1401(9). "Special education" is "specially designed instruction ... to meet the unique needs of a child with a disability"; "related services" are the support services "required to assist a child ... to benefit from" that instruction. 20 U.S.C. §§ 1401(26), (29). A State covered by the IDEA must provide a disabled child with such special education and related services "in conformity with the [child's] individualized education program," or IEP. 20 U.S.C. § 1401(9)(D). "To meets its substantive obligations under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S.Ct. at 999.

Here, Plaintiffs argue that CFCSD substantively violated the IDEA and denied A.D. a FAPE by failing to recognize that A.D.'s autism and serious emotional disturbance qualified her as a "child with a disability" in need of special education services, including vocational services. (Doc. No. 49 at pp. 42-44.) The Court rejects these arguments for the same reasons set forth *supra*, in connection with Plaintiffs' argument that CFCSD violated the "child find" provisions of the IDEA.[41]

Accordingly, and for all the reasons set forth above, the Court rejects Plaintiffs' argument that CFCSD denied A.D. a FAPE by failing to identify her as a "child with a disability" for purposes of the IDEA.

---

[41] Plaintiffs emphasize that the State of Ohio found A.D. to be significantly disabled and entitled to vocational services. (A.R. 3552.) While this may be the case, the State of Ohio's determination on this issue is separate and distinct from the determination of whether A.D. constitutes a "child with a disability" for purposes of the IDEA.

**VI.** **Conclusion**

For all the foregoing reasons, Plaintiffs' Amended Motion for Judgment on the Administrative Record (Doc. No. 49) is DENIED. The CFCSD Defendants' request that this Court dismiss Counts II and II of the Complaint (Doc. No. 55-1 at p. 27) is GRANTED. Counts II and III of the Complaint are hereby DISMISSED.

Defendants' request that this Court "issue a show cause order why the Dougalls' attorney should not be liable to Copley-Fairlawn for attorneys fees in this action" pursuant to 20 U.S.C. 1415(i)(3)(B) is DENIED. The CFCSD Defendants have not shown that the instant action is frivolous, unreasonable, or without foundation, or presented for an improper purpose such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

**IT IS SO ORDERED.**

          *s/Pamela A. Barker*
          PAMELA A. BARKER
Date: January 28, 2020          U. S. DISTRICT JUDGE